**Henry T. SANDERS, Plaintiff-Appellant,**

**v.**

**JOHN NUVEEN & CO., INC., Defendants-Appellees.**

**Henry T. SANDERS, Plaintiff-Appellee,**

**v.**

**JOHN NUVEEN & CO., INC., Defendants-Appellants.**

**Nos. 71–1163, 71–1164.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1972.

Decided June 9, 1972.

Maurice J. McCarthy, Melville B. Bowen, Jr., Chicago, Ill., for Henry T. Sanders.

James B. O'Shaughnessy, Joel A. Haber, Allan Horwich, Milton H. Cohen, Michael Ford, Dey W. Watts, Chicago, Ill., for John Nuveen & Co.

Before HASTINGS, Senior Circuit Judge, and KILEY and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal raises two principal issues: (1) whether promissory notes with a maturity not exceeding nine months but offered to the public as an investment are "securities" within the definition of the Securities Exchange Act of 1934 and (2) whether the representative of an antagonistic class can properly intervene and assume representation of the plaintiff class without notice to the members of that class?

Plaintiff, Henry T. Sanders, filed his complaint on March 12, 1970, against John Nuveen & Co., Inc., a broker-dealer in securities, one of its registered representatives, and its directors and controlling persons. The complaint charged defendants with a scheme and artifice to defraud plaintiff and others in his class by selling to them short-term commercial paper issued by Winter & Hirsch, Inc. but owned by Nuveen. Plaintiff's claim was based on the Securities Act of 1933, 15 U.S.C. § 77a, the Securities Exchange Act of 1934, 15 U.S.C. § 78a, Rule 10b–5, 17 C.F.R. § 240.10b–5, and the Rules of Fair Practice of the National Association of Securities Dealers.

On May 18, 1970, the defendants moved to strike certain allegations of the complaint and expressly attacked the class-action aspects of the complaint. They also challenged the jurisdiction of the court under the 1934 act on the ground that the short-term commercial paper involved was not a "security." The district court denied the motion to strike on October 8, 1970.

On October 19, 1970, the plaintiff served on defendants his motion, to be presented to the court on November 2, requesting that a notice be sent to the class represented by plaintiff as provided in Rule 23(c) (2) of the Federal Rules of Civil Procedure. The class suggested was "all persons who were purchasers of short-term commercial paper which was issued by Winter & Hirsch, Incorporated, and sold by John Nuveen & Co., Inc."

On October 29, the First National Bank of Chicago and the Harris Trust and Savings Bank sought leave to intervene on their own behalf and "on behalf of certain creditors of Winter & Hirsch, Incorporated."

The motion to intervene stated that on March 11, 1970 (one day prior to the filing of plaintiff's suit), the creditors of Winter & Hirsch had met and had elected an informal creditors' committee. The creditors' committee, working with the management of Winter & Hirsch, had negotiated with Mercantile Financial Corp. a purchase agreement relating to substantially all of Winter & Hirsch's loan receivables; the agreement required certain waivers by holders of long-term debt obligations. The motion also stated that the creditors' committee had developed a liquidating trust to become effective upon the execution and delivery of a "Consent and Agreement" by all the lenders of funds to Winter & Hirsch, including plaintiff.

At the same time that they sought to intervene, the two banks also moved that the district court enter an order pursuant to Rule 23(d) directing the plaintiff to execute a "Consent and Agreement" on a stipulation by all parties

that its execution would "not constitute a dismissal or compromise under Federal Rule 23(e)."

The banks' motions were not accompanied by any pleadings in the Rule 7(a) sense of complaints or answers, or by documents seeking to adopt pleadings already on file.

Plaintiff's counsel were notified by telephone the night before that the banks were going to appear before the district judge on October 29; counsel were given copies of the motions at 10 a. m. on the 29th as court convened. The court continued the matter to 1:45 p. m., at which time the plaintiff filed written objections to the motions. The court heard argument by the parties but no evidence in the afternoon, at which time the court requested the parties to attempt to agree on an order. The banks delivered a proposed form of order to plaintiff's counsel at 4 p. m. and advised them that they would reappear in court at 4:30. Plaintiff's counsel replied that they would need some time to read the proposed order and confer with their client. They appeared at the courtroom at 4:50 to learn that the judge had entered an order at 4:35 and left the bench. The order permitted the banks to intervene and directed the plaintiff to sign the stipulation and consent by 5 p. m. or the class aspects of the complaint would be stricken. The intervention was allowed on behalf of creditors including all members of the class which plaintiff sought to represent.

The plaintiff filed a motion to vacate the October 29 order, which motion was denied on November 5, 1970. The court's reason was "the plaintiff's expressed opposition to all members of the class by refusing to join in a compromise that all of them have agreed to enter into." On its own motion, the court found that "there may be a class described in the cause without counsel," whereby he ordered that "said cause . . . proceed as an individual complaint."

On November 17, 1970, the district judge certified pursuant to 28 U.S.C. § 1292(b) the questions (1) whether it was error to permit the banks to intervene, (2) whether it was error to find that the plaintiff did not represent the class and (3) whether it was error to strike the class aspects of the complaint. On the motion of defendants, the court on the following day amended its prior order denying defendants' motion to strike, to certify another question under 28 U.S.C. § 1292(b): whether the commercial paper upon which the complaint is predicated is a "security" as defined in section 3(a) (10) of the Securities Exchange Act of 1934.

This court granted leave to appeal on all four questions on December 21, 1970.

We consider first the threshold question of whether a security under the 1934 act is involved.

## I

Federal securities legislation enacted for the purpose of avoiding frauds is to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." S.E.C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963).

Particularly, the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." S.E.C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). "[I]n searching for the meaning and scope of the word 'security' in the [Securities Exchange] Act [of 1934], form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

The Supreme Court has sanctioned, in interpreting the definition of a security

in the 1934 act, recourse to the definitions of security in the Securities Act of 1933 (*Tcherepnin* at 335–336, 338, 88 S. Ct. 548) and in the "companion legislative enactments." Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

An examination of the six basic federal securities acts is relevant and revealing.

The Securities Act of 1933,[1] The Trust Indenture Act of 1939,[2] the Investment Company Act of 1940,[3] and the Investment Advisers Act of 1940,[4] all define a security as follows: "The term 'security' means any note, . . . evidence of indebtedness, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security' . . . ."[5] The Public Utility Holding Company Act of 1935[6] definition differs slightly: " 'Security' means any note, . . . investment contract, . . . or, in general, any instrument commonly known as a 'security' . . . ."[7]

■ In none of these five acts does there appear any language limiting in any way the broad definitions of "security" or of "note," "evidence of indebtedness," "investment contract" or "instrument commonly known as a security." Therefore *any* note, regardless of its nature, terms or conditions, is fully subject to whatever antifraud provisions are included in the five acts.

Only in the Securities Exchange Act of 1934 is there an exception to the broad definition of a security; it reads:[8]

"The term 'security' means any note, . . . investment contract, . . . or in general, any instrument commonly known as a 'security'; . . . but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

Therefore only in the 1934 act is a note with a maturity not exceeding nine months withdrawn from the application of the antifraud provisions of the act, section 10(b) and Rule 10b–5. Since the same note is subject to the antifraud provisions of all the other securities acts, it becomes important to determine just what Congress intended to be exempt from the operation of the 1934 act.

Although all notes are subject to the antifraud provisions of the other acts, some of those acts exempt short-term commercial paper from registration or other requirements.[9] Plaintiff urges that the meaning given to short-term obligations in other securities legislation, particularly the 1933 act, be applied to the definition found in the 1934 act. The 1933 act exempts from registra-

1. Section 2(1). 15 U.S.C. § 77b(1).

2. Section 303(1). 15 U.S.C. § 77ccc(1).

3. Section 2(a) (36), 15 U.S.C. § 80a–2(a) (36).

4. Section 202(a) (18). 15 U.S.C. § 80b–2 (a) (18).

5. Mr. Justice Blackmun, in commenting upon the language of Rule 10b–5 said that proscriptions of the securities laws, by "repeated use of the word 'any,' are obviously meant to be inclusive." Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972).

6. Section 2(a) (16). 15 U.S.C. § 79b(a) (16).

7. In Tcherepnin v. Knight, 389 U.S. 332, 344, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), the Supreme Court found no "controlling significance" in the fact that the term "evidence of indebtedness," which was included in the 1933 act, was omitted from the 1934 act.

8. Section 3(a) (10). 15 U.S.C. § 78c(a) (10).

9. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (withdrawable capital shares of savings and loan association subject to Rule 10b–5 although exempt from registration). *See also* Opinion of Director of Trading & Exchange Division of S.E.C., Release No. IA–40, 11 F.R. 10997 (1945).

tion,[10] but not from antifraud sanctions,[11] "[a]ny note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions," and which has a maturity not exceeding nine months.

The Securities and Exchange Commission has interpreted the 1933 act's exemption of short-term commercial paper as embodying four requirements: [12]

> "The legislative history of the Act makes clear that section 3(a) (3) applies only to (1) prime quality negotiable commercial paper (2) of a type not ordinarily purchased by the general public, that is, (3) paper issued to facilitate well recognized types of current operational business requirements and (4) of a type eligible for discounting by Federal Reserve banks."

Although no evidence has been heard in this case, the record shows that the commercial paper purchased by the plaintiff was dated January 30, 1970, and that "Winter & Hirsch was engaged in the business of making loans until in or about February 1970, when it advised its creditors of its precarious financial condition and ceased to make any further payments on any of its obligations for borrowed money." At that time it had assets of $12.5 million and liabilities

of more than $36 million. Thus, because of the company's insolvency, it seems highly unlikely that the paper purchased by the plaintiff and members of his class is either prime quality or issued to facilitate current transactions or eligible for discounting by Federal Reserve banks.

The record further shows that the commercial paper purchased by the plaintiff was "placed through John Nuveen & Co." and bought by 42 purchasers, including the plaintiff, in the aggregate face amount of $1,661,500. The paper was therefore obviously offered and sold to the general public; indeed, it was characterized in the issuer's financial statements as "short term open market" paper.[13] The notes fail to meet any of the S.E.C.'s four requirements for exemption.

■ If, as the Supreme Court has admonished, "form should be disregarded for substance" and economic reality emphasized, it is reasonably clear that plaintiff and his class purchased the kind of "security" in regard to which the securities acts were intended to offer protection against fraud, misrepresentation and non-disclosure.[14] Five of those acts expressly did so. We believe Congress intended to protect against fraud the purchasers of securities such

---

10. Section 3(a) (3). 15 U.S.C. § 77c(a) (3).

11. Section 17(c). 15 U.S.C. § 77q(c).

12. Release No. 33–4412, 17 C.F.R. § 231.-4412 (1961) (numerals added). The release emphasized the prime quality of the paper intended to be exempted and stated that the exempted items are "composed of assets easily convertible into cash and are comparable to liquid inventories of an industrial or mercantile company." During the hearings on the 1933 act, commercial paper discountable by Federal Reserve banks was described as having "a record of safety only second to Government bonds" and as being the basis of our currency. Hearings on S. 875 Before the Senate Comm. on Banking and Currency, 73rd Cong., 1st Sess. at 94, 95 (1933). It is significant that section

3(a) (10) of the 1934 act exempts "currency" from the definition of security. 15 U.S.C. § 78c(a) (10).

13. H.R.Rep.No.85, 73rd Cong., 1st Sess., 15 (1933) stated in discussing the bill, which became the Securities Act of 1933, "Paragraph (3) exempts short-term paper of the type available for discount at a Federal Reserve bank and of a type which rarely is bought by private investors."

14. Forty of the purchasers invested from $3,000 to $100,000 and the other two invested $150,000 and $205,000. In *Tcherepnin*, the Supreme Court, noting that small investors were involved, said (389 U.S. at 345, 88 S.Ct. at 558): "Policy considerations lead us to conclude that these petitioners are entitled to the investor protections afforded by the Securities Exchange Act."

as those involved here under the 1934 act as well.[15]

The court in Anderson v. Francis I. duPont & Co., 291 F.Supp. 705, 708–709 (D.Minn.1968), reached the same conclusion. Promissory notes of less than nine months' maturity were given in exchange for investments in defendant's commodities market scheme. The court held the 1934 act applicable to the notes.

Our conclusion is further supported by Congress' characterization of short-term commercial paper in exempting it from certain provisions (but not anti-fraud provisions) of two of the other securities acts. Certain provisions of the Public Utility Holding Company Act of 1935 do not apply to a note or draft with a maturity not exceeding nine months, provided that it "is not part of a public offering" and aggregates not more than 5 percent of the other securities of the company.[16] The Investment Company Act of 1940 defines "short-term paper" as paper with a maturity not exceeding nine months "and such other classes of *securities, of a commercial rather than investment character*, as the Commission may designate by rules and regulations." [17]

In other words, when Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities.[18] When a prospective borrower approaches a bank for a loan and gives his note in consideration for it, the bank has purchased commercial paper. But a person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment.

*Cf.* City National Bank v. Vanderboom, 290 F.Supp. 592, 608 (W.D.Ark.1968), aff'd, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L. Ed.2d 560 (1970).

Although further evidence may be necessary to determine the issue, the allegations of the complaint together with additional information in the record on appeal indicate a strong possibility that Nuveen's arrangements with the plaintiff and with the members of plaintiff's class also constitute investment contracts. Apparently, Nuveen purchased the Winter & Hirsch paper at a discount and resold it to the 42 purchasers at a different rate of discount in order to realize a profit. At least in the plaintiff's case (and evidence would be necessary to determine in how many other cases), the use of plaintiff's funds for the short-term notes was a temporary arrangement "in lieu of tax exempt municipal bonds and . . . the money so invested would be available for purchase of tax exempt bonds at an early date."

It seems likely that the arrangements between Nuveen and plaintiff constituted "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." S.E.C. v. W. J. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946). *See also* 1 Loss, Securities Regulation 489–91 (1961); Anderson v. Francis I. duPont & Co., 291 F.Supp. 705, 708 (D.Minn.1968).[19]

However, in view of our interpretation that the instruments involved here are securities since they are notes not covered by the exemption, we do not need to determine whether as a matter

---

15. Professor Loss equates the 1933-act meaning of security with that of the 1934 act to some extent: "Short-term notes of the type which are *exempted from registration* under the Securities Act by § 3 (a) (3) are *excluded from the definition of 'security'* in the Exchange Act." 2 Loss, Securities Regulation 796 (1961).

16. Section 6(b). 15 U.S.C. § 79f(b).

17. Section 2(a) (38). 15 U.S.C. § 80a–2(a) (38) (emphasis added)

18. Although some of the paper placed through Nuveen went to banks, the large majority of purchasers were individuals.

19. Professor Bromberg has noted, "Even if short term notes are effectively excluded from the definition of security, their use in connection with an investment contract or other transaction constituting a security does not immunize the transaction from the antifraud rules." Bromberg, Securities Law, Fraud, SEC Rule 10b–5, § 4.6 (321) (1971).

of fact the arrangements between the parties also constituted investment contracts.

## II

The remaining three issues certified for determination can be considered together: whether the allowance of the banks' intervention was proper and whether the district court erred in finding that the plaintiff did not represent the class and in striking the class allegations from the complaint.

The record discloses that the two intervening banks are holders of "short term senior debt" as banks extending lines of credit, First National Bank of Chicago in the amount of $1,750,000 and Harris Trust and Savings Bank in the amount of $1,000,000. As such, neither bank would come within the class suggested by the plaintiff, namely, all persons who were purchasers of short-term commercial paper which was issued by Winter & Hirsch and sold by John Nuveen & Co. The plaintiff has alleged in addition, and the banks have not denied, that each bank is also the holder or owner of substantial amounts of long-term debt of Winter & Hirsch, which is described in the liquidating trust agreement as "junior subordinated debt."

Since it is acknowledged by all parties that Winter & Hirsch is insolvent and unable to pay its debts as they mature, it is reasonably certain that the creditors will eventually receive less than the amounts which they are owed. It follows that any advantage obtained by one class of creditors will cause other classes of creditors to be disadvantaged. The two intervening banks, as members of at least two classes of creditors other than the class represented by the plaintiff, are *per se* antagonistic to the plaintiff's class. It is obvious that the banks can neither represent the plaintiff's class nor strengthen the representation of plaintiff's class by intervening.

The portions of Rule 23(d) pertaining to intervention in class actions are intended to strengthen the adequacy of representation of the class.[20] The Advisory Committee's Note to Rule 23 emphasizes, "Subdivision (d) is concerned with the fair and efficient conduct of the action" through supplementary notice to members of the class and by strengthening the class where necessary.[21]

Since the district judge did not provide for any notice to the plaintiff class, it was clearly improper for him to permit the two banks, with their conflicting and antagonistic interests, "to intervene herein, on their own behalf and on behalf of those creditors of Winter & Hirsch, Incorporated set forth in Exhibit B to the Motion to Intervene." That exhibit listed, among others, the members of plaintiff's suggested class: all persons who were purchasers of short-

---

20. Fed.R.Civ.P. 23(d): "In the conduct of actions to which this rule applies, the court may make appropriate orders: . . . (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors. . . . "

21. Advisory Committee Note to Rule 23 states in part: "Subdivision (d) (2) sets out a non-exhaustive list of possible occasions for orders requiring notice to the class. . . . [The] mandatory notice pursuant to subdivision (c) (2), together with any discretionary notice which the court may find it advisable to give under subdivision (d) (2), is designed to fulfill requirements of due process to which the class action procedure is of course subject. . . . Subdivision (d) (3) reflects the possibility of conditioning the maintenance of a class action, *e. g.*, on the strengthening of the representation . . . ; and recognizes that the imposition of conditions on intervenors may be required for the proper and efficient conduct of the action."

term commercial paper which was issued by *Winter & Hirsch* and sold by *Nuveen.* The effect of such intervention was to weaken the plaintiff class and possibly to strip from it advantages which it held against other classes of creditors, including the classes of which the two intervening banks are members. The attempt to include some protective language in the intervention order did not alter the fact that once antagonistic parties purported to represent the class, the plaintiff's cause virtually collapsed. No intervention could be accomplished without prior full and fair notice to the members of plaintiff's class and, of course, such notice could not be given until the court determined whether plaintiff's suggested class fulfilled the requirements of Rule 23(a) and (b) (3).[22]

█ If in fact the banks had procured the "consent and agreement" of all the members of plaintiff's class other than plaintiff, such consent and agreement was meaningless within the context of this cause of action unless procured after full and fair notice and disclosure to the members of the class, under the supervision of the court, of their possible rights in this cause, of the conflicting interests of other classes of creditors, including the banks, and of the surrender of certain rights by consenting and agreeing to the liquidating trust arrangement. The purpose of the mandatory notice and disclosure requirements of Rule 23(c) (2) is to advise all class members of their rights and privileges under the close supervision of the court.

This is not to say that the banks could not intervene under any circumstances. Once the court has determined whether the plaintiff's suggested class satisfies the requirements of Rule 23(a) and (b) (3), and once members are notified under Rule 23(c) (2), the banks may seek to intervene under Rule 24(a) (2). They would petition not as representatives of the plaintiff's class, but as applicants who claim "an interest relating to the property or transaction which is the subject of the action and [are] so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect that interest. . . ." At that point, the court may determine that the members of plaintiff's class are entitled to supplementary notice under Rule 23(d) (2).[23]

If the banks seek to intervene under those circumstances, Rule 24(c) and sound judicial administration require that their motion to intervene "shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought." The pleading should be one of those described in Fed.R.Civ.P. 7(a) so that all parties understand the position, claims and nature of relief sought by the prospective intervenors.

Once the due process requirements of Rule 23 are satisfied by full and fair notice to all members of any class or classes or subclass or subclasses determined by the court, the court may then "make appropriate orders . . . determining the course of proceedings."[24]

The basic error in these proceedings was permitting two members of antagonistic classes to intervene on behalf of another (plaintiff's) class and not only to purport to take over plaintiff's case but in effect to introduce an entirely different cause of action in which all parties but plaintiff had previously

---

22. Hohmann v. Packard Instrument Co., 399 F.2d 711 (7th Cir. 1968).

23. In order to expedite the proceedings, the court may determine that it is feasible to combine the mandatory notice under Rule 23(c) (2) with the discretionary notice under 23(d) (2).

24. Fed.R.Civ.P. 23(d) (1). It should also be noted that not only may a class be divided into subclasses if that course seems advisable to the trial court (Rule 23(c) (4)), but also that any order fixing classes or subclasses "may be conditional, and may be altered or amended before the decision on the merits" (Rule 23(c) (1)).

"consented" without notice and disclosure under court supervision of their rights and options. The error was compounded by attempting to coerce the plaintiff to add his consent.

In No. 71–1163 we reverse the orders which allow intervention, which find the plaintiff not representative of the class alleged in the complaint and which strike allegations in the complaint as to class action. In No. 71–1164, we affirm the order denying the motion to strike certain allegations of the complaint, because the commercial paper on which the plaintiff predicated his claim for relief is a "security" under the Securities Exchange Act of 1934. The case is remanded for further proceedings consistent with this opinion.