**MALLINCKRODT CHEMICAL WORKS, Plaintiff,**

v.

**GOLDMAN, SACHS & CO. et al., Defendants.**

**No. 71 Civ. 1437 (CHT).**

United States District Court, S. D. New York.

Sept. 13, 1976.

---

Cadwalader, Wickersham & Taft, New York City, for plaintiff; Peter M. Brown, Richard J. Wiener, W. Mowry Connelly, Terence F. Gilheany, New York City, of counsel.

White & Case, New York City, for defendant Dun & Bradstreet, Inc.; P. B. Konrad Knake, Jr., W. Neil Thomas, III, Alexander C. Sanger, New York City, of counsel.

TENNEY, District Judge.

Mallinckrodt Chemical Works ("Mallinckrodt") filed this action against Goldman, Sachs & Company ("Goldman, Sachs"), Dun & Bradstreet, Inc. ("Dun & Bradstreet") and Manufacturers Hanover Trust Company ("Manufacturers Hanover"), alleging violations of Sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77l(2), 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); the New York Martin Act, N.Y. General Business Law § 352–c; and the common law. Jurisdiction is based on Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a); Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa; diversity of citizenship, 28 U.S.C. § 1332(a); and the doctrine of pendent jurisdiction. The action against Goldman, Sachs and Manufacturers Hanover having been settled prior to trial, the issues as against Dun & Bradstreet alone have been tried to the Court. This action is one of many instituted against Goldman, Sachs and others arising out of the sale by Goldman, Sachs of the commercial paper of Penn Central Transportation Company ("PCTC").

Against Dun & Bradstreet the complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934 (Third Cause of Action), the New York Martin Act (Fourth Cause of Action), and claims of fraud and negligence under the common law of the State of New York (First and Second Causes of Action). The acts alleged to constitute violations of law consist of alleged misrepresentations and alleged omissions.

Defendant Goldman, Sachs is a partnership engaged in the business of investment banking, purchase and sale of commercial paper, securities brokerage, and related financial activities. Its principal office is in New York City, and there are other offices located in St. Louis, Philadelphia, Chicago, Los Angeles and other cities. Plaintiff Mallinckrodt is a Missouri corporation with its principal place of business in St. Louis. At all times pertinent hereto Lester Gluesenkamp was its Assistant Treasurer and was responsible for short-term investments. Gluesenkamp held degrees in accounting, banking and finance, was a trained financial analyst, and in 1968–70 had made at least 93 purchases of commercial paper totalling over 41 million dollars on behalf of Mallinckrodt. According to Gluesenkamp, Mallinckrodt had a criterion that it would only purchase commercial paper rated "prime."

On April 1, 1970, as a result of a debenture offering, Mallinckrodt had $5 million in surplus funds to invest in short-term money market instruments. Gluesenkamp testified that on that date he telephoned Russel Pope of Manufacturers Hanover in New York City to inquire about available investments; that Pope suggested an issue of PCTC notes and explained that PCTC was the product of a merger of the Penn Central and New York Central railroads, that it had suffered an operating loss the previous year but was nevertheless rated "prime." Gluesenkamp did not recall any mention of PCTC's actual earnings or assets by Pope. It is not disputed that Gluesenkamp purchased $1 million of PCTC commercial paper on April 1, 1970 through Manufacturers Hanover. This was the first time he had purchased commercial paper through that bank.

Gluesenkamp testified that he spoke with Robert Harre, sales manager of the St. Louis office of Goldman, Sachs, about plaintiff's prospective funds for investment. Gluesenkamp had dealt with Goldman, Sachs since 1965, purchasing commercial paper from them on an average of three to four times per month and talking with them regularly. Gluesenkamp further testified that on April 1, 1970 he had asked Harre what securities Goldman, Sachs had available and that Harre suggested PCTC among others. Harre repeated in effect what Pope had told Gluesenkamp earlier, including the fact that PCTC was rated "prime." Harre did not recall any mention of the rating. However, it is not disputed that on April 1 or 2, 1970 Gluesenkamp purchased $500,000 of PCTC commercial paper from Goldman, Sachs.[1]

As will be seen hereinafter, there is a substantial basis for skepticism as to the reliance by Gluesenkamp on the "prime" rating quoted for the PCTC paper. First, however, it is necessary to place the defendant Dun & Bradstreet in the context of this litigation.

During the relevant period Dun & Bradstreet had a division called the National Credit Office ("NCO") which assigned credit ratings to its subscribers. Although defendants Manufacturers Hanover and Goldman, Sachs were subscribers, Mallinckrodt was not.[2] NCO assigned a "prime" credit rating to "[c]ompanies with a net worth or capital funds (net worth plus long term subordinated loans) in excess of $25,000,000, which also meet NCO requirements and credit judgment in all other respects."[3]

---

1. From Gluesenkamp's testimony it would appear that the purchase from Goldman, Sachs occurred on April 1, 1970. However, it has been stipulated that the purchase date was April 2, 1970.

2. Manufacturers Hanover was only a subscriber to the wholesale and retail services of NCO.

3. At all times pertinent hereto NCO assigned credit ratings to companies subscribing to its service and issuing commercial paper as follows:

| | |
|---|---|
| Prime | Companies with a net worth or capital funds (net worth plus long term subordinated loans) in excess of $25,000,000, which also meet NCO requirements and credit judgment in all other respects. |
| Desirable | Companies with net worth or capital funds (net worth plus long term subordinated loans) in excess of $5,000,000 to $25,000,000, which also meet |

Paragraphs 36 and 46 of the complaint, which charge a violation by Dun & Bradstreet of Section 10(b) of the Securities Exchange Act of 1934, allege three specific material misrepresentations by NCO to Mallinckrodt:

"(a) The promissory notes of Penn Central [PCTC] were of 'prime' quality;

(b) Penn Central [PCTC] had a sound earnings record, a strong balance sheet and an excellent financial reputation;

(c) Penn Central [PCTC] was financially free of weak points, such as heavy debt position, insufficient bank lines, etc."

However, prior to June 21, 1970 (when PCTC filed a petition for reorganization pursuant to Section 77 of the Bankruptcy Act), Gluesenkamp had never written or talked to anyone at NCO and, as already noted, Mallinckrodt was not a subscriber to NCO services. No one from NCO ever told Gluesenkamp that PCTC had a sound earnings record, a strong balance sheet, an excellent financial reputation, was financially free of weak points, had no heavy debt position, or anything at all about bank lines. Prior to June 21, 1970 any information Gluesenkamp received explaining the NCO rating system, individual ratings, or the scope of its activities, was secondhand, allegedly obtained through conversations with Goldman, Sachs personnel. Harre, with whom he frequently conversed on investment matters, had no recollection of any such conversations. Gluesenkamp's lack of knowledge of NCO's ratings is evidenced by his belief that the "prime" rating required a company to have *assets* of $25 million, while the actual criteria is $25 million in *net worth* or capital funds.

There is no evidence to justify Gluesenkamp's interpretation on April 1, 1970 of the alleged representation that PCTC paper was "prime" as meaning that PCTC "had a sound earnings record, a strong balance sheet and an excellent financial reputation," or that PCTC "was financially free of weak points, such as a heavy debt position, insufficient bank lines, etc." After the purchases, Goldman, Sachs sent Gluesenkamp its green, yellow and white sheets containing financial information on PCTC, including the former's information sheet of February 18, 1970 detailing PCTC's 1969 preliminary earnings report.

Since any "reliance" by Mallinckrodt on misrepresentations or omissions by NCO rests on the testimony of Gluesenkamp, that testimony must be weighed with great care. Gluesenkamp's claim that Mallinckrodt had a criterion that it would only purchase commercial paper rated "prime" by NCO and that this was conveyed to both

| | |
|---|---|
| | NCO requirements and credit judgment in all other respects. |
| Satisfactory | Companies with net worth or capital funds (net worth plus long term subordinated loans) ranging from approximately $1,200,000 to $5,000,000, which also meet NCO requirements and credit judgment in all other respects. |
| | This classification is also given larger companies with net worth or capital funds (net worth plus long term subordinated loans) in excess of $5,000,000 which do not meet NCO requirements and credit judgment in all other respects. |
| Fair | Companies which do not meet a sufficient number of NCO's requirements for the three preceding classifications. |
| No Rating | Companies which do not meet any NCO requirements for inclusion in the Commercial Paper Market. |

Subscribers to NCO's services receive periodically lists of companies issuing commercial paper. In addition, NCO's subscribers for no additional fee may register for reports and information on such companies in which they are interested, consisting of analytical reports, expressions of opinions by NCO, and financial information on the company as it becomes available.

Manufacturers Hanover and Goldman, Sachs is not supported by documentary evidence. Moreover, this is disputed both by Pope of Manufacturers Hanover, with whom Gluesenkamp was dealing for the first time, and by Harre of Goldman, Sachs, with whom he had had past dealings. It was not until PCTC had filed for reorganization on June 21, 1970 that Gluesenkamp asked Pope for a letter stating that NCO had rated PCTC "prime" on April 1, 1970 and also wrote NCO to inquire about its rating system, even though Mallinckrodt was not a subscriber. There is no question that PCTC commercial paper was rated "prime" from August 1968 through April 1 or 2, 1970. The fact that Gluesenkamp relied on the independent judgments of Goldman, Sachs, and Manufacturers Hanover, however, is not evidence of his reliance on NCO.

Through its division NCO, defendant Dun & Bradstreet typically enters into appraisal agreements with issuers of commercial paper and with institutions engaged in the sale of commercial paper, such as Goldman, Sachs, providing such subscribers with its rating and publication services. Pursuant to the subscription agreement, NCO sends a subscriber lists of companies issuing commercial paper together with the ratings assigned by NCO to those companies. In addition, a subscriber may register to receive reports and bulletins concerning any specific issuer in which it may be interested. In the main, those bulletins consist of financial information released by the issuer, which NCO passes along to its subscribers, together with news judged important by NCO and its opinions with respect to such matters.

It appears that the issuance of a "rating" was a selling point for the appraisal agreements. However, the agreements between NCO and its subscribers who sought information pertaining to various commercial paper issuers cautioned as follows:

"2. NCO shall not be responsible for any loss caused by the neglect, error or misconduct of agents, attorneys, or employees, in procuring, collecting, and communicating, or failing to communicate said information to the subscriber, nor is the correctness of the said information guaranteed in any manner, by NCO.

"3. If NCO, its agents, attorneys or employees shall furnish suggestions as to the advisability of extension of credit, it is understood that the correctness thereof is in no wise guaranteed and they shall not be liable in connection therewith."

In addition, all information NCO provided pursuant to the subscription agreement carried the following legend:

"THIS REPORT MAY NOT BE REPRODUCED IN WHOLE OR IN PART IN ANY FORM OR MANNER WHATEVER. It is furnished by NATIONAL CREDIT OFFICE in strict confidence at your request under your Subscription Agreement for your exclusive use as a basis for credit, insurance, marketing and other business decisions and for no other purpose. These prohibitions are for your own protection—your attorney will confirm the seriousness of this warning. Apprise NATIONAL CREDIT OFFICE promptly of any question about the accuracy of information. NATIONAL CREDIT OFFICE does not guarantee the correctness of this report and shall not be liable for any loss or injury caused by the neglect or other act or failure to act on the part of said company and/or its agents in procuring, collecting or communicating information."

"Commercial paper," as generally understood in the financial community, is an unsecured promissory note issued by a corporation, having a maturity at the time of issuance not exceeding nine months. Though not exclusively, commercial paper is usually sold through dealers who purchase the notes from the issuer and then resell them to the customer. Goldman, Sachs was the exclusive dealer in PCTC paper and traded in this and other commercial paper primarily as a principal for its own account.

Banks also are frequently involved as agents in purchasing the commercial paper for customers. Manufacturers Hanover acted as a principal in this case. The final character in this drama is the customer who purchases the commercial paper. Usually a sophisticated investor, the typical customer is a corporation with personnel trained in the investment of surplus corporate funds. Mallinckrodt was such a customer.

NCO stated in its letters to prospective *issuers* of commercial paper that it made "authoritative appraisals"; no such representations were made to *purchasers* of commercial paper. However, one would be naive to believe that NCO was completely unaware that purchasers on occasion did inquire from the seller as to the rating and that the purchaser could and did, on occasion, become a subscriber of NCO. An appraisal is not an audit; it is not an investigation or verification beyond the published financial information, and NCO never represented to its subscribers or to the public that it investigated issuers of commercial paper, or that it verified the information which it received from the issuers. Goldman, Sachs did not make NCO's rating a part of its sales presentation, and its use of the rating was contractually limited. The NCO rating is not like a bond rating that is published and quoted for the world to see, nor is the rating available to the general public. However, when specifically asked by customers what the rating was, some Goldman, Sachs salesman would tell them.

Furthermore, in judging NCO it does not serve any useful purpose to concentrate on what NCO did or did not do in 1968 in connection with the rating of the Penn Central Company, the predecessor of PCTC, or what NCO did or did not do after April 1 or April 2, 1970. The crucial period appears to be the nine months period before April of 1970. However, some historical background of PCTC may help to set NCO's alleged acts or "omissions" in the proper context.

On February 1, 1968, following approval by the Interstate Commerce Commission ("ICC") and affirmance by the Supreme Court of the United States, the merger of the Pennsylvania Railroad and the New York Central Railroad became effective, creating the Pennsylvania New York Central Transportation Company. Later in 1968 the name was changed to the Penn Central Company. On October 1, 1969, an organizational change was made creating a holding company named the Penn Central Company. The only significant asset of the holding company was 100% ownership of the common stock of the railroad company, Penn Central Transportation Company. PCTC was the parent company of the entire railroad system, holding the stock of a number of different railroads, substantial real estate, and all of the outstanding common stock of the Pennsylvania Company, an investment company with principal holdings in railroads primarily outside of the PCTC railroad system. It also held all of the common stock of the Buckeye Pipeline Company and controlling interests in two large real estate development companies, Arvida Corporation (Florida) and the Great Southwest Corporation (California, Georgia and Texas). PCTC was the largest railroad in the country, one of the six largest corporations in the country and the largest owner of real estate.[4]

---

4. On October 1, 1969 the name of the railroad company was changed from the Penn Central Company to the Penn Central Transportation Company. All of the assets held by the railroad company prior to this change continued to be owned after the change by the railroad company, *i. e.*, the Penn Central Transportation Company. The issuer of the commercial paper which gives rise to this action was the railroad company, the Penn Central Transportation Company. Although during the time period here in question, the railroad had various names, hereinafter the railroad company will be referred to as "PCTC," and its parent, the Penn Central Company, will be referred to as the "Penn Central Company."

The newly created parent company, the Penn Central Company, remained for a period of time as a holding company with no assets other than the stock of PCTC. In February 1970, the Penn Central Company acquired the Southwestern Oil and Refining Company and the Royal Petroleum Company, each of which were relatively small petroleum product companies

On July 21, 1968 PCTC entered into a subscription agreement with NCO whereby, for an annual fee of $300, NCO agreed to appraise PCTC in connection with its issuance of commercial paper.

On July 29, 1968 the ICC approved PCTC's application for authority to issue $100 million of commercial paper and on the same date approved PCTC's application to increase its Revolving Credit Agreement with various banks to a like amount.

On August 1, 1968, NCO rated PCTC as "prime" and so advised its subscribers. The documentary evidence does not set forth the foundation for the original rating. However, the present dispute is not concerned with the basis for the original rating but with its subsequent continuance on April 1 and 2, 1970.

On March 17, 1969 PCTC issued its annual report with consolidated financial statements for the year ended December 31, 1968 showing that on a consolidated basis PCTC (then Penn Central Company) had assets valued in excess of $6.5 billion and a net worth of almost $3 billion. Although for that period the railroad operations suffered a net loss from ordinary operations of about $2.8 million, on a consolidated basis the company showed earnings of approximately $90.2 million. On March 20, 1969 the ICC approved PCTC's application for authority to issue an additional $50 million in commercial paper notes for a period up to September 30, 1969, bringing the total authorized amount to $150 million. Shortly thereafter, on April 1, 1969, PCTC arranged a $300 million Revolving Credit Agreement. Fifty-two United States banks participated in that "$300 million revolver," including Manufacturers Hanover. On April 21, 1969 NCO distributed to its subscribers its credit report advising as to PCTC's bank lines, year-end fiscal data, background, earnings, and proposed new financing. The "prime"

rating was continued. On April 23, 1969 the first quarter financial results for PCTC were publicly announced. Those results showed consolidated earnings of $4.6 million, and a loss from railroad operations of $12.8 million. On May 12, 1969, the "$300 million revolver" was approved by the ICC. On July 28, 1969 PCTC released its earnings figures for the second quarter and the first six months of 1969. For the six months then ended those results shows consolidated earnings of $26.5 million and a loss from railroad operations of $21 million.

It was not until early October that NCO was called upon to make a further analysis of PCTC. At that time Rudolph Merker[5] had become Vice President of NCO in charge of its Commercial Paper Department and directly responsible for PCTC. Merker succeeded Allen Rogers, who continued as senior analyst and consultant. On October 2, 1969 Rogers called Merker and mentioned an article in the New York Times relating to an opinion by Equity Research Associates indicating that it would no longer recommend the purchase of stock of the Penn Central Company. Merker reviewed the current PCTC credit file which included the 1968 balance sheet, NCO's commercial paper report of April 21, 1969, pages from Moody's Transportation Manual, newspaper clippings and notes concerning PCTC's bank lines.

After checking the six-month earnings report for the period ending June 30, 1969, Merker telephoned Jack Vogel, head of the credit department of Goldman, Sachs. Vogel told Merker that in July PCTC had increased its revolving bank credit lines to $300 million with an additional $50 million available from other lines, that its $150 million of commercial paper was supported by $100 million in bank lines, and that the company had a new financial vice-president,

---

which did not significantly affect the balance sheet of the Penn Central Company.

5. Due to illness, Merker did not testify, but his prior testimony in *Cathedral Estates Inc. et ano. v. Gustave L. Levy et al., Goldman, Sachs & Co., and Dun & Bradstreet Inc.*, 358 F.Supp. 348, tried in this Court, was received in evi-

dence in lieu of his testimony. While Merker's testimony in *Cathedral Estates* reflects patent inaccuracies, it at least establishes that NCO did not neglect the affairs of PCTC or close its eyes to developments, or engage in any conduct which could possibly be characterized as fraudulent or grossly negligent.

Jonathan O'Herron. Merker relayed this information to Rogers, and on October 3 he wrote O'Herron requesting the PCTC September 30 interim operating figures, a list of banks and bank credit lines, the high and low in borrowings, and the amount of short-term bank debt.

On October 20, 1969, the third-quarter and nine-month financial results for the Penn Central Company were publicly announced, showing consolidated earnings for the nine months then ended of $17.6 million and a loss from railroad operations of $10.2 million.[6] In a letter dated October 27, 1969, O'Herron furnished Merker with the information he had requested in addition to the above figures for the Penn Central Company. Since Merker was absent from NCO at the time, Rogers issued a bulletin to the NCO subscribers reflecting the third-quarter and nine-month financial results of the Penn Central Company and giving the opinion that PCTC's commercial paper standing was not affected because of PCTC's readily saleable assets. A report was also sent to NCO's subscribers on October 29, 1969 relating to the comparative nine-month figures of the Penn Central Company.

On November 6, 1969 the ICC approved an increase in outstanding PCTC commercial paper from $150 million to $200 million, which O'Herron had forecast in his October 27 letter to Merker. On November 26, 1969 PCTC publicly announced the omission of its fourth-quarter dividend in order to conserve cash. This release was forwarded to NCO's subscribers. At this time Merker again reviewed the PCTC situation for NCO and concluded that there were assets available for supporting loans if necessary. On December 24, 1969 a $50 million Pennsylvania Company offering was sold, the proceeds of which were to be made available to PCTC, a positive development in Merker's estimation.

On February 4, 1970 PCTC publicly released its fourth-quarter and preliminary 1969 year-end earnings. That release showed earnings on a consolidated basis of $4 million, as compared with $90.2 million the year before, and the railroad alone had an operating loss of $56 million. The loss for the fourth quarter was $13.2 million. The preliminary earnings statement was discussed by Merker with the NCO analysts, including Rogers. NCO sent the press release containing the earnings statement, both consolidated and for the railroad alone, to its subscribers on February 5. NCO did not change its rating at this time, preferring instead to wait to observe the effect of the preliminary statement on the balance sheet of PCTC. Merker observed that on a consolidated basis operations still returned a profit and therefore no rating change was warranted at the time.

On that date, however, Rogers called Vogel of Goldman, Sachs and expressed concern over the sharply reduced earnings. According to Vogel, Rogers asked him whether Goldman, Sachs was continuing to sell PCTC commercial paper and whether he, Vogel, felt that PCTC had sufficient assets to pay down debt. Vogel answered both questions in the affirmative. If he knew, Vogel did not divulge to Rogers that Goldman, Sachs had been shocked by the loss for the fourth quarter, which had been expected to show a profit. Nor did anyone disclose to NCO that Robert Wilson, head of the Commercial Paper Department of Goldman, Sachs, had called O'Herron of PCTC on February 5, 1970 about the bad news and told him that "it was unfortunate that we did not have some indication of the magnitude of the total losses for 1969, as we are going to need a story to tell existing holders of Penn Central's paper and new purchasers of paper." While Goldman, Sachs indicated to O'Herron that it would

**6.** Plaintiff finds fault with the reliance by NCO on the consolidated earnings of the Penn Central Company, in light of the loss in earnings by PCTC, the issuer of the paper. However, PCTC had non-railroad subsidiaries whose assets and earnings were available. Furthermore, the Penn Central Company had utilized its assets held by subsidiaries for financing. There is no evidence that inquiry as to what assets were encumbered was warranted. The certified consolidated balance sheet for year-end 1969 showed that PCTC alone had assets in excess of $4.5 billion and a net worth of $1.8 billion.

continue to offer this paper, including the $15-odd million that Goldman, Sachs had in its own inventory, Wilson did explore the possibility of PCTC buying back this inventory out of bank credit lines then available to it. No one advised NCO that on February 5, 1970 Brown Brothers Harriman & Co., who had held as much as 15% of the total outstanding paper of PCTC through purchases from Goldman, Sachs, had removed that paper from their approved list, nor was NCO informed that Goldman, Sachs had met with O'Herron and other officials of PCTC on February 6, at which time it was divulged that PCTC had a budgeted loss of $56 million for 1970, which, when added to $170 million of additional necessary financing, resulted in a cash requirement of $226 million for that year. Of this $226 million, Goldman, Sachs was advised that $70 million had already been arranged for, that PCTC would attempt a $100 million bond sale in the future, but that it would seek a $50 million "bridge" loan in the meantime. Likewise, there was no mention that on February 9, 1970 PCTC bought back $10 million of its paper from Goldman, Sachs, reducing the latter's inventory to just below $5 million. The $50 million "bridge" loan, disclosed at the February 6 meeting between Goldman, Sachs and PCTC, was memorialized in a Credit Agreement dated March 2, 1970 between the Pennsylvania Company and Chemical Bank. The loan was unsecured and its proceeds were subsequently loaned by the Pennsylvania Company to the railroad. Manufacturers Hanover loaned $10 million of the $50 million.

On March 31, 1970 NCO received the PCTC annual report for the year ended December 31, 1969 and distributed it to subscribers registered for service on PCTC. When Eugene Schenk, who became president of NCO in December 1969, reviewed the annual report with Merker later in April he concluded that the earlier determination to wait for the arrival of that report had been correct. NCO's review committee, which included Merker and Rogers, had determined that no change in the rating was necessary because of the significant amount of assets available to raise funds, cognizance that the operating results of the subsidiaries had been in the black, that the railroad had received freight rate increases, that the dividend had been discontinued, and that the passenger line write-off had not impaired working capital.

On April 1, 1970 Goldman, Sachs sold to plaintiff through its agent, Manufacturers Hanover, PCTC commercial paper in the face amount of $1 million due on September 30, 1970. Manufacturers Hanover charged plaintiff's account and paid Goldman, Sachs the sum of $958,520.83. On April 2, 1970 Goldman, Sachs sold to plaintiff PCTC commercial paper in the face amount of $500,-000 due on November 30, 1970 and plaintiff paid Goldman, Sachs $472,270.83.

It was not until April 23, when Merker saw PCTC's press release of April 22 regarding its first-quarter loss, that he and Schenk noted that for the first time PCTC had incurred losses on a consolidated basis. On that date Merker wrote O'Herron seeking information and stating that NCO was reviewing the rating.[7]

## DISCUSSION

The applicability of the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934 fundamentally depends upon whether the notes involved herein were securities. Section 3(a)(10) of that Act (15 U.S.C. § 78c(a)(10)) provides that the term security "means any note . . . but shall not include . . . any note . . . which has a maturity at the time of issuance of not exceeding nine months." Commercial paper of PCTC has been before this court on at least two recent occasions, and in each case has been held to be a "security" within the meaning of Section 3(a)(10). *Franklin Savings Bank in the City of New York v. Levy*, 406

---

7. O'Herron failed to reply to this letter or to Merker's follow-up letter dated May 18, 1970. On June 1, 1970 NCO advised its subscribers that the classification of the PCTC paper had been reserved pending further developments.

F.Supp. 40 (S.D.N.Y.1975); *Welch Foods Inc. v. Goldman, Sachs & Co.,* 398 F.Supp. 1393 (S.D.N.Y.1974). In *Zeller v. Bogue Electric Manufacturing Corporation,* 476 F.2d 795 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), the court agreed with *Sanders v. John Nuveen & Co., Inc.,* 463 F.2d 1075 (7th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), that despite the wording of the exemption, a promissory note with a maturity of less than nine months may still be a "security" under the 1934 Act when offered to the public as an investment "unless the note fits the general notion of 'commercial paper' reflected in the SEC Release." *Zeller, supra,* 476 F.2d at 800. In *Sanders,* the SEC Release referred to was 33–4412, 17 C.F.R. § 231.4412 (hereinafter "Release") which stated:

> "The legislative history of the Act makes clear that section 3(a)(3) [of the 1933 Act] applies only to (1) prime quality negotiable commercial paper (2) of a type not ordinarily purchased by the general public, that is, (3) paper issued to facilitate well recognized types of current operational business requirements and (4) of a type eligible for discounting by Federal Reserve banks."

While the quoted Release dealt with the exemption of a security from the registration requirement of the 1933 Act, *Zeller* holds that there is no doubt that the SEC would take the same view with respect to the exclusion provided in Section 3(a)(10) of the 1934 Act. Judge Friendly, however, in writing for the *Zeller* court, recognized that the 1933 Act and 1934 Act differ in their method of handling short-term commercial paper. Under the 1933 Act, while Section 2(1) provides that any note is a "security", Section 3(a)(3) exempts short-term commercial paper similar to that exempted by the 1934 Act. However, Section 17, the general anti-fraud provision of the 1933 Act, provides in subsection (c) that the exemptions under Section 3(a)(3) shall be inapplicable. Under the provisions of Section 3(a)(10) of the 1934 Act, short-term commercial paper was excluded from the definition of a "security", and there is no further provision in that Act restoring short-term commercial paper to the category of "security". Thus, as Judge Friendly conceded, "[i]f the letter of the 1934 Act is followed, paper falling within this proviso is thus excluded from all provisions of the 1934 Act, including those dealing with fraud." *Zeller, supra,* 476 F.2d at 799.

I must accept, however, Judge Friendly's conclusion that the SEC would take the same view with respect to the nature of the exclusion in the 1934 Act as with respect to the exclusion in the 1933 Act. Accordingly, it seems that the original indebtedness represented by the PCTC commercial paper was not "issued to facilitate well recognized types of current operational business requirements." Rather, it appears to have been used to fund past capital expenditures and matured debt obligations, thereby falling outside the exemption for notes "of a type eligible for discounting by Federal Reserve banks." *Franklin Savings Bank in the City of New York v. Levy, supra,* 406 F.Supp. at 43; *compare Welch Foods Inc. v. Goldman, Sachs & Co., supra,* 398 F.Supp. at 1399.

It should be noted, however, that the court in *Zeller* did not look for all four elements expounded in the Release, but spoke only of a note fitting "the general notion of 'commercial paper' reflected in the SEC Release." *Zeller, supra,* 476 F.2d at 800. Rather, it considered the nature of the purchase as determinative, *e. g.,* whether the purchaser was an investor. This is the teaching in *Sanders, supra,* 463 F.2d at 1080:

> "[W]hen Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities. When a prospective borrower approaches a bank for a loan and gives his note in consideration for it, the bank has purchased commercial paper. But a person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment." (Footnote omitted.)

In the instant case, the PCTC notes were clearly purchased as an investment by plaintiff. Therefore, I am constrained to find that plaintiff is entitled to whatever remedies may be available to it under Section 10(b).

As already noted, Dun & Bradstreet, through NCO, is charged with specific material misrepresentations to Mallinckrodt as set forth in paragraphs 36(a), (b) and (c) of the complaint. Gluesenkamp's own testimony establishes that the specific misrepresentations as to the financial strength and good health of PCTC (Complaint ¶¶ 36(b) and (c)) were not made to Mallinckrodt, and there is no evidence of record that such misrepresentations were ever made by NCO to its subscribers or anybody else.

This leaves the misrepresentation alleged in paragraph 36(a) that "the promissory notes of [PCTC] were of 'prime' quality." This can only refer to NCO's credit rating of "prime," an *opinion* which plaintiff characterizes as a *misrepresentation*.

Plaintiff has also alleged that Dun & Bradstreet, through NCO, made material misrepresentations to it by omitting to tell it that PCTC's notes were not prime, that Dun & Bradstreet and NCO had made no adequate or independent investigation, and that in various respects PCTC was in serious financial condition.[8]

To succeed under Section 10(b), plaintiff must prove by competent evidence that Dun & Bradstreet made a misrepresentation or omitted facts necessary to make statements it did make not misleading, that it did so with intent to deceive, manipulate or defraud, and that plaintiff acted in reliance on this. *Schlick v. Penn-Dixie Cement Corporation,* 507 F.2d 374, 380 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). The burden of proof rests on plaintiff as to all the elements of its causes of action. Plaintiff must first prove that there has been an "untrue statement of a material fact" by NCO or an omission by NCO "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .." Rule 10b–5.

Assuming that the simple designation of the PCTC paper as "prime" was a statement of fact, rather than an opinion, was it an untrue statement? And if it was untrue, did NCO know this?

The Court's pursuit of the answers to the foregoing questions must be limited to the conditions existing on April 1 and 2, 1970 and preceding those dates. Any other perspective, despite plaintiff's contentions, would mean judging the issues by 20–20 hindsight. Plaintiff must show that on or before the aforementioned dates Dun & Bradstreet, through NCO, should not have rated PCTC "prime," a rating which denotes a company with a net worth in excess of $25 million and presumably able to meet its short-term obligations as they came due. PCTC had a net worth over one hundred-fold that required for the prime rating. Its consolidated balance sheet for the period ended December 31, 1969, as certified by reputable auditors, shows that PCTC had a *net worth* of approximately $2.81 billion, a relatively slight decrease from the amount reflected on the balance sheet for the prior year. While the balance sheet for the railroad for the period ended December 31, 1969 showed a deficit working capital of approximately $126.7 million, the deficit for the prior year had been approximately $136 million. Although substantial assets of PCTC were pledged, and accordingly would

---

8. More specifically:

(1) By either Dun & Bradstreet standards or industry standards the PCTC notes were not of "prime" quality (Complaint ¶ 37(a));

(2) Dun & Bradstreet made inadequate independent investigation and had not verified the financial condition and affairs of PCTC (Complaint ¶ 37(b));

(3) Facts concerning the financial condition of PCTC including severe cash shortages, inability to secure long-term financing, non-existence of pledgeable assets, large and increasing operating losses and working capital deficits, inability to raise debt maturity expenses and other anticipated expenses, lack of commitments from any source to assure redemption of its commercial paper with insufficient bank lines to meet those requirements and poor earnings in the fourth quarter of 1969 (Complaint ¶¶ 37(c)-(h)).

not be readily accessible for paying off commercial notes, its net worth exceeded its liabilities, and PCTC was able to raise $50 million through the sale of unsecured debentures in December 1969 and a like amount through an unsecured bank loan in March 1970. Moreover, in November 1969, when PCTC applied for an increase from $150 million to $200 million commercial paper outstanding, the ICC concluded that PCTC was in a strong financial position.

In sum, the PCTC paper clearly met the net worth or capital funds requirement for a "prime" rating, and there is no clear evidence that it did not "also meet NCO requirements and credit judgment in all other respects." As has been noted, substantial assets of PCTC were encumbered, but there is no evidence that inquiry as to which assets remained unencumbered was warranted to determine what part of the $6 billion in assets, which exceeded liabilities by almost $3 billion, could be utilized to raise money to pay $100 or $200 million in commercial paper.

Although plaintiff contends that NCO should have had manuals and internal standards regarding levels of assets and liabilities and certain ratios, there is no evidence as to what such standards in credit analysis should be. It was NCO's normal practice to utilize audited financial statements in analyzing public companies such as PCTC for the extension of credit. NCO employed ratios, but whether the credit analyst uses a mathematical formula or not, he weighs the balance sheet items, and ratios are at best only a starting point. It is the final judgment on the extension of credit, gleaned from the financial statements, which is important. There is no ironclad procedure for analyzing the credit of an issuer. That determination must be made on a company-by-company basis. The issuer is not being analyzed for the performance of its stock but for its ability to meet short-term commitments. NCO judged that PCTC was creditworthy and could pay off its nine-month paper. With respect to a portion of the paper issued, its judgment was not correct. However, there is no evidence that

NCO believed on April 1 or 2, 1970 that its rating or opinion was not correct. Accordingly, if there was a misstatement of fact, it was an unwitting one.

Apparently aware that any misstatement as to the rating was innocent in nature, plaintiff has also attempted to show negligence so gross as to constitute fraud. Such attempt consists primarily in an attack on the competence of NCO as evidenced by lack of documentation to support the original rating of the PCTC paper in 1968, although there is no evidence that the original rating was incorrect. In any event, evidence of prior negligence would be irrelevant.

Despite plaintiff's contentions, the Court finds the staff of NCO to have been fully competent. As has been shown, NCO clearly was following and analyzing PCTC during the period from October 2, 1969 up until the sale of the notes involved herein, considering not only the public information which it received and disseminated to its subscribers, but also communications with PCTC itself and conversations with Goldman, Sachs. Plaintiff has attempted to show that NCO continued PCTC's "prime" rating upon the affirmation by Goldman, Sachs that it would continue to market the PCTC paper. If this was a factor behind NCO's conclusion to continue the rating, it was not an improper one. Goldman, Sachs was the exclusive agent for the PCTC paper and accordingly a reliable source of information. *Green v. Jonhop, Inc.,* 358 F.Supp. 413, 421 (D.Or.1973). There is no evidence that NCO was aware either that Goldman, Sachs owned a substantial amount of the paper or, more important, that Goldman, Sachs had arranged for the repurchase of much of that paper by the issuer.

Plaintiff also finds fault in NCO's alleged failure to "investigate" PCTC. Indeed, among the omissions charged is a failure to inform the general public or more particularly plaintiff (a member of that class) that it did not independently and adequately investigate and verify the financial affairs of PCTC. (Complaint, ¶ 37(b)). The remaining alleged omissions consist of infor-

mation it presumably would have acquired by the exercise of an imputed "duty" to investigate and verify. There is no evidence that NCO held out that it "investigated" issuers of commercial paper, or that it "verified" information. Plaintiff attempts to impose upon Dun & Bradstreet, through NCO, a duty to become an "insider" of any company which it rated. The argument proceeds to urge that if NCO had obtained the information which Goldman, Sachs had acquired from PCTC, it would never have continued the "prime" rating for the PCTC paper. In any event, no evidence was introduced to show that a credit rating organization such as NCO could gain access to inside and confidential information from an issuer or its underwriter, and NCO never represented that it did. It was current and aware of publicly available financial information concerning PCTC and the Penn Central Company, and reasonably relied upon that.

Furthermore, in order to demonstrate fraudulent conduct on the part of Dun & Bradstreet through the acts or omissions of NCO, plaintiff must prove an intent to deceive or defraud. Mere negligence will not suffice. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Cohen v. Franchard Corp.,* 478 F.2d 115, 123 (2d Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973). At best, only "recklessness that is equivalent to wilful fraud" will suffice. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 868 (2d Cir. 1968). There is no evidence that NCO's judgments on PCTC were not made in good faith or that its judgments or reports were false. Even if the failure to discover material facts when such facts are ascertainable without inordinate effort were held sufficient under Rule 10b-5, there is no evidence here in support of such a standard. Nor would this hypothetical duty to investigate run to plaintiff who had no contractual relationship with NCO. As stated in *In re Republic National Life Insurance Company,* 387 F.Supp. 902, 905 (S.D.N.Y.1975):

> "Section 10(b) of the Exchange Act and Rule 10b-5 adopted thereunder were not intended to embrace or stifle financial

statistical reporting services such as those here involved or to impose on them the burden of verifying the published reports of companies which they collect and recount in their services.

> There is no allegation that either defendant possessed any inside information or had greater access to information concerning Republic than investors."

Even if plaintiff could prove that the "prime" rating of PCTC was a misrepresentation made with an intent to deceive or defraud—and the Court finds to the contrary—the necessary element of reliance would not be established. *Chelsea Associates v. Rapanos,* 527 F.2d 1266, 1271–72 (6th Cir. 1975); *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 238–39 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975). The Court finds that plaintiff was induced to purchase the PCTC paper not by the prime rating but by the recommendation of plaintiff's agent, Manufacturers Hanover. The claim of reliance upon the rating by NCO rests on the testimony of Gluesenkamp alone. This testimony is disputed by both Manufacturers Hanover and Goldman, Sachs, and is further cast in doubt by the subsequent actions of Gluesenkamp, to which reference has already been made herein. In making its recommendations to plaintiff, Manufacturers Hanover clearly relied not upon the prime rating, but upon its own judgment as to the creditworthiness of PCTC.

## CAUSE OF ACTION UNDER SECTION 352–c OF THE NEW YORK BUSINESS LAW

Plaintiff's fourth cause of action (Complaint ¶¶ 49–50) alleges a violation by Dun & Bradstreet, through NCO, of Section 352–c of the New York General Business Law. Section 352–c makes it unlawful to make "[a]ny representation or statement which is false, where the person who made such representation or statement . . . knew the truth . . .." As has already been stated, the evidence does not support a finding that the statement or opinion given

in the form of a rating was false, and more particularly that NCO knew, or should have known, that it was false. Furthermore, there has not been a sufficient showing of reliance on the part of plaintiff. Accordingly, there has been no violation of the New York statute.

## CAUSES OF ACTION BASED ON COMMON LAW FRAUD AND NEGLIGENCE

Plaintiff's first and second causes of action (Complaint ¶¶ 31–39 and ¶¶ 40–45) charge Dun & Bradstreet and NCO with common law fraud and negligence.

In order to recover for fraud plaintiff must prove, by clear and convincing evidence, that NCO misrepresented a material fact; that NCO knew it was false; that NCO made the misrepresentation with the intent to deceive plaintiff and to induce it to rely on it; that plaintiff did in fact rely on it; and that plaintiff was damaged thereby. As has already been shown in connection with the statutory causes of action, plaintiff has not met that burden.

Furthermore, ordinary negligence is not actionable. There has been no showing of gross negligence as to warrant recovery. *Ultramares Corporation v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931).

It is not necessary for the Court to rule on the objections to various deposition testimony offered in evidence since that testimony has not been relied upon by the Court.

Judgment will enter in favor of defendant Dun & Bradstreet.

So ordered.