Clement J. McDONALD, Individually and as Class Representative of Holders of 4½% Convertible Income Bonds Series B, Plaintiff-Objector-Appellant,

v.

CHICAGO MILWAUKEE CORPORATION et al., Defendants-Appellees.

Morton WEINRESS, Individually and as Class Representative of Holders of 5% Income Debentures Series A, Plaintiff-Appellee,

and

Raymond J. McDonald, Intervenor-Objector-Appellant,

v.

CHICAGO MILWAUKEE CORPORATION et al., Defendants-Appellees.

No. 77–1127.

United States Court of Appeals, Seventh Circuit.

Argued April 27, 1977.

Decided Oct. 7, 1977.

As Amended Oct. 11, 1977.

Donald C. Gancer, Querrey, Harrow, Gulanick & Kennedy, Chicago, Ill., for appellants.

Joe A. Sutherland, David D. Rosenstein, Jerome H. Torshen, Thomas P. Sullivan, U. S. Atty., Richard James Stevens, Harold E. Spencer, Chicago, Ill., for appellees.

Before PELL and WOOD, Circuit Judges, and GORDON, District Judge.*

PELL, Circuit Judge.

This appeal involves three class action suits, consolidated in the district court below, initiated by various holders of railroad securities. On December 9, 1976, the district court entered a judgment approving an agreement of settlement and dismissing the consolidated actions. Objectors Clement J. McDonald and Raymond J. McDonald, father and son, holders respectively of Series B Bonds and Series A 5% Income Debentures, jointly noticed an appeal from the judgment.[1]

The essential facts pertinent to our disposition of this appeal are the negotiation of the settlements and the district court's approval thereof. The published notice, set forth in an Appendix to this opinion, describes the fundamental allegations, issues, and theories of recovery. No useful purpose is furthered by duplicating herein its summation of the class actions. Because that notice provides no detail relating to the

---

* District Judge Myron J. Gordon of the Eastern District of Wisconsin is sitting by designation.

1. None of the parties in *Koch and Lewis, et al. v. Chicago Milwaukee Corporation, et al.,* No. 76 C 2598 (N.D.Ill. December 9, 1976), has filed a separate notice of appeal. That case, which involves Series A and Terre Haute bonds,

presents issues inextricably bound up with those in Nos. 74 C 780 and 75 C 2033. For that reason, the defendants-appellees required that the settlements be taken "as a package." Although 76 C 2598 is not formally before us, we have allowed Koch and Lewis to participate in this appeal by brief and oral argument.

allegations of fraud and collusion which are raised in this appeal, our opinion will set forth pertinent material from depositions and affidavits relating to those charges. We note, however, that the truth or falsity of sworn testimony was for the district court to determine.

Objectors-appellants have made a direct allegation of conflict of interest and an inferential charge of collusion in arriving at the compromise of this litigation. Thus, the present appeal presents not only the typical issue of whether or not the district court abused its discretion by approving the settlements as fair, reasonable, and adequate as to all classes, but also brings into play related questions regarding the adequacy of representation by one of the named plaintiffs and the professional propriety of certain actions undertaken by his counsel. This court in *Susman v. Lincoln American Corp.*, 561 F.2d 86 (7th Cir. 1977), discussed some of the constitutional and policy considerations relating to the "adequacy" requirement of Rule 23(a)(4), Fed.R.Civ.P. The present appeal necessitates further refinements in this circuit's approach to those matters.

I

Morton Weinress, the representative plaintiff in the Income Debentures action, has substantial holdings in the securities of the Milwaukee Road and further acts as a financial advisor to other investors who hold substantial interests in railroad securities. Weinress's holdings are not limited to Debentures but extend also to stock of Chicago Milwaukee Corporation and perhaps to its substantially held subsidiary, the Milwaukee Road itself. Moreover, David Rosenstein, the attorney for the class of Debenture holders, himself owns 700 shares of Chicago Milwaukee Corporation and $20,000

face value Series B Bonds, as well as Debentures. At the time of Weinress's motion for class certification, the fact of the stockholdings in the defendant corporation was not disclosed. Thus, the district court lacked important information when, on June 9, 1976, it designated Weinress as the representative of the class and likewise designated Rosenstein as attorney for the class.

Objector Raymond McDonald first argues that there is a clear conflict of interest on the part of both class representatives, the named plaintiff and the attorney for the class. He cites J. Moore, Federal Practice § 23.07[3], at 23–401 (2d ed. 1975), as authority for the proposition that, in order adequately to represent a class or subclass, a party's interests must be wholly compatible with and not antagonistic to those whom he would represent. He argues that the record in the instant case gives rise to a strong inference that Weinress and the defendants were not situated at arm's length regarding the negotiation of the settlement.

The conflict-of-interest argument rests not merely upon the fact of stock ownership but upon an analysis of the variance in the responses by the defendants to various named plaintiffs. In the Series B Bond case, when Clement J. McDonald filed his motion for certification, the defendants learned that he also owned 100 shares of railroad stock, acquired for the purpose of receiving annual reports, and objected to his adequacy as a representative plaintiff.[2] However, when Weinress filed his motion for class certification in the Income Debentures case, no deposition was taken, no objections were filed by defendants, and no memoranda in opposition were filed. This inaction occurred even though Quinn, Chairman of the Milwaukee Road, and Merrill, General Counsel and one of the attor-

2. The defendants' Memorandum in Objection to the Motion that the Action be Maintained as a Class Action argued as follows:

The named plaintiff testified at his deposition . . . that he was also the owner of common stock in the Milwaukee Road. The interests of the common stockholders of the Milwaukee Road are potentially adverse to

those of the Series B Bondholders in that the payment of additional interest to the Bondholders would decrease the equity of the common stockholder. Because of this conflict, the named plaintiff cannot fairly and adequately represent the interests of the Series B Bondholders.

neys of record for the railroad, had actual knowledge that both Weinress and Rosenstein had a similar securities position. Objector McDonald thus contends that there is an inescapable inference that the defendant was pleased to have Weinress and Rosenstein as class representatives, knowing they were more interested in their overall investments in the securities of the railroad than with getting the best results for the class of Debenture holders. McDonald submits that the fact that the railroad failed to call the court's attention to the conflict of interest which both Weinress and Rosenstein had gives rise to the inference of much less than an arm's length relationship, if not to an inference of collusion.

McDonald further observes that Weinress supposedly commenced negotiating as representative of the Debenture class in the Spring of 1975, at a time when he had not yet even filed suit let alone been appointed class representative. He further notes that the final settlement agreement was essentially concluded shortly after April 2, 1976, but that Weinress was not appointed class representative until June 9, 1976. He cites as authority for the impropriety of premature, unauthorized settlement negotiations in class actions a passage in the Manual for Complex Litigation.[3]

In *Susman, supra*, 561 F.2d 86 at 90, this court observed that whether a party will adequately protect the interests of the class is a question of fact depending on the circumstances of each case, citing *Schy v. Susquehanna Corporation*, 419 F.2d 1112, 1116 (7th Cir. 1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55; 7 Wright & Miller, Federal Practice and Procedure § 1765, at 622 (1972 ed.). We further recognized that a district judge's determination of the adequacy of representation is a matter of discretion and will not be disturbed on appeal unless abuse of discretion is shown. We also noted that a basic consideration of fairness requires that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation. *Susman, supra* at 89. The principles articulated in *Susman* were by no means novel, and they are fully applicable to the instant appeal.

The district court's formulation of its ultimate finding that the settlement was achieved after extensive negotiations at arm's length does not refer formally or directly to the allegations of unauthorized negotiations, the differential response to McDonald and to Weinress, or to the conflict position of one who simultaneously holds debt and equity instruments. Omission of a detailed statement of the history of settlement negotiations is unfortunate in a case where non-frivolous allegations of fraud and collusion are raised, even if such a statement might generally not be necessary when passing upon the fairness of a proposed class settlement.

We turn to the first set of allegations. The record does establish that Weinress and Rosenstein were involved in settlement negotiations with the defendants prior to the time of class certification. However, these negotiations, in substantial part, related to the settlement of related state court litigation. Indeed, the complaint in No. 75 C 2033 was filed only after those discussions broke down.

Approximately three weeks after the defendants filed a motion to dismiss Clement McDonald's Series B action, Weinress and Rosenstein met with officers of the Milwaukee Road, *i. e.*, Quinn and Merrill. At that meeting, neither officer was able to explain the origin or purpose of the "deficit carry forward" provision of the Indenture applicable to the Series A 5% Income Debentures. Rosenstein, acting as Weinress's legal advisor, subsequently wrote to Quinn and Merrill stating that no provision of the Debenture Indenture should be construed to

---

3. "Care should be taken to avoid undesirable, premature, unauthorized settlement negotiations in class actions. Before any settlement negotiations occur, there should be a class action determination. Thereafter, all settlement negotiations on behalf of the class should be conducted by counsel representing the class in the litigation." Manual for Complex Litigation 42 (1973 ed.).

require that available net income, as defined therein, take into account any deficits of prior years. Within a month or so of that letter, the Milwaukee Road filed suit in the Circuit Court of Cook County seeking, among other things, a construction of the Debenture Indenture which would require the deficit to be carried forward to succeeding years.

The procedural history of the state court litigation provides the requisite context within which to assess the charge that Weinress and his attorney violated the suggested procedure set forth in the Manual. Weinress sought to intervene in the state court action. Moreover, he and Rosenstein met with officers and attorneys of The First National Bank of Chicago, Trustee under the Debenture, and explained the theories by which Milwaukee Road's positions in the state declaratory judgment suit could be defeated. Undoubtedly, the meetings in April and May of 1975 focused on the equity accounting and deficit carry forward issues. These matters did relate to McDonald's complaint in the Series B action, but they also bore a direct relation to the state court litigation. It was only after the discussions broke down that Weinress filed the complaint in No. 75 C 2033.

■ The district court had no opportunity to pass upon the objection of premature and unauthorized settlement negotiations, as objector-appellant McDonald did not raise this point below. The suggestion of the Manual that there should be a class action determination before any settlement negotiations occur wisely provides for the majority of cases. Here, however, there was related state litigation the resolution of which bore upon Weinress's claim to interest. His participation in the 1975 discus-

sions was justified because of his involvement with that suit. Weinress's participation in the negotiations of March and April 1976 stands on a slightly different footing. This round of negotiations had been initiated in January 1976 by Merrill, and Weinress's federal complaint was then on file. However, Weinress's counsel quickly prepared and filed a motion for certification of the class. The record establishes that that motion was filed prior to the period of critical negotiations which fixed the basic terms of the final settlement agreement. That the formal certification order was not entered until June 9, 1976, stems basically from the court's continuances, which were granted because settlement negotiations were then proceeding. Under the circumstances, we cannot say that Weinress's participation in the settlement meetings was premature or unauthorized.[4]

■ We are unable to say that the defendants' differential responses to McDonald as representative of the Series B Bondholders and to Weinress as representative of the Series A Income Debentures calls for an inference of collusion. The failure of the defendants to object to Weinress's motion for class certification must likewise be analyzed in light of the settlement negotiations. At the time when the defendants objected to Clement J. McDonald's motion for certification, questioning his adequacy as a representative of Series B Bondholders, they were pressing vigorously their motion to dismiss or, alternatively, to refer issues to the Interstate Commerce Commission under the doctrine of primary jurisdiction.[5] Vigorous assertion of all arguable points quite early in litigation represents a prototypical defense tac-

4. In an appeal from an order approving a class action settlement, we are not called upon to review the rationale underlying a district court's continuance orders. However, we cannot fail to note that the court's delay in ruling upon the class action motion in the Debenture case placed Weinress and Rosenstein in a position where they either had to abstain from participation in the discussions or controvert the literal language of the Manual for Complex Litigation.

5. On February 4, 1976, the district court denied the defendants' motion to refer the accounting issues to the Interstate Commerce Commission and to stay proceedings pending such reference. The defendants have appealed that ruling to this court in No. 76–1292, but that appeal, as well as the related actions in the Circuit Court of Cook County and in the Illinois Appellate Court, will be dismissed pursuant to the settlement agreement.

tic. However, such a tactic diminishes in importance after two rounds of settlement negotiations, the last of which has culminated in a tentative agreement which disposes of all pending actions and appeals.

Additionally, we note that the fact of Weinress's stockholdings was brought to the court's attention prior to its approval of the settlement. No doubt, it would have been preferable to have informed the court of Weinress's securities position prior to June 1976 instead of making the disclosure four or five months later. It is undisputed, however, that the court possessed this information prior to its finding of arm's length negotiations. Thus, the court was aware of the facts which Raymond McDonald now interprets as "apparently collusive conduct" prior to its ruling that each of the actions was proper under Rule 23(b)(1) of the Federal Rules of Civil Procedure. We cannot say that the district court erred reversibly in discounting the significance of the delay in disclosure.

■ The most serious aspect of the appellants' argument concerns Weinress's holdings in stock as well as Debentures. The fact of dual holdings presents at least a potential conflict of interest. The appellants cite *Wood v. Rex-Noreco, Inc.,* 61 F.R.D. 669 (S.D.N.Y.1973), a Rule 10b–5 case involving substantial and conflicting interests between stock purchasers before and after alleged misrepresentations, as the basic support for their contention that Weinress's stockholdings made him an inadequate class representative under Rule 23(a)(4).[6] Although we regard the *Wood* case as inapposite, we do not regard as frivolous the appellants' contention that a shareholder so obviously has an active and continuing interest in the corporate defendant's financial well being that he cannot be expected to represent, in an arm's length manner, parties who are not shareholders.

The appellants' argument concerning a potential conflict of interest, of course, pushes toward a rule that one who simultaneously holds stock and debt instruments can never adequately protect the interests of a class of debt holders. There is some support in the cases for adopting such a strict approach to the adequacy problem. Thus, in *Sanders v. John Nuveen & Co., Inc.,* 463 F.2d 1075, 1081 (7th Cir. 1972), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302, this court determined that two intervening banks, as holders of "short term senior debt" and "long-term junior subordinated debt," were *per se* antagonistic to a class of purchasers of "short-term commercial paper." We determined that it was reasonably certain that the creditors would eventually receive less than the amounts which they were owed, so that any advantage obtained by one class of creditors would cause other classes of creditors to be disadvantaged. *Id.*

That *Sanders* cannot fairly be read as establishing an absolute approach to potential conflicts of interests seems established in the light of *Susman's* express declination of adherence to a *per se* approach. See 561 F.2d at 93 n.9. The approach of this circuit when facing Rule 23(a)(4) questions is to devote attention to the particular facts of each case.

Here, the appellants have not formally alleged that Weinress's dual holdings are in the same corporate defendant. The suggestion that he may hold stock in the Milwaukee Road is analogous to the "mere imaginative speculation" referred to in *Susman.* See 561 F.2d at 94 n.11. Moreover, there is not a single suggestion in the present record that any stockholder claims that he will be disadvantaged by the negotiated settlement with the four classes of debt holders. To be sure, the appellants assert that Weinress's acceptance of the settlement betrays the class he represented. However, the district court was presented with this objection and found instead that the interests of the various classes, including that of the

---

6. The appellants consistently refer to Rosenstein as a class representative, presumably on the theory that in class litigation, the attorney for the class takes on the role of the *dominus*

*litis.* We shall treat the questions pertaining to Rosenstein's asserted conflict of interest and professional improprieties in Part II of this opinion.

Debenture holders, had been "vigorously prosecuted."

There is another significant difference between this case and *Sanders*. The latter came before this court by way of an interlocutory appeal, whereas the present consolidated appeal is taken from the order approving the settlement. The difference is appropriately noted when charges relating to potential conflicts of interest are voiced. Here, the court's finding of arm's length bargaining was made after an opportunity to observe whether Weinress's potential conflict had ever materialized in such a fashion as to impede his vigorous presentation of the claims of Debenture holders. We find that the district judge did not under the circumstances of this case abuse his discretion in first ruling that Weinress was an adequate representative and subsequently confirming that each of the actions was a proper class action.

Our approval of the lower court's finding inexorably adds a gloss to the "wholly compatible" language of the Moore treatise. In effect, we are ruling that parties other than "pure" shareholders or "pure" creditors are certifiable as class representatives. Thus we are determining that litigation context warrants a finding that the interests of shareholders and debenture holders can ultimately prove to be, as in this case, wholly compatible despite the theoretical existence of a conflict. We are not persuaded that policy considerations pertinent to the conflict of interest present where a class representative's possible recovery is far outweighed by attorney's fees which might be awarded to a law firm in which he is a member, which we have recognized as an inherent conflict of interest justifying a refusal to certify, see *Susman, supra,* 561 F.2d at 94, n.11, carry over to a situation where the individual plaintiff seeking to secure class status happens to hold both stocks and debentures. In sum, the "inherent conflict" which emerges in cases where there is available only a minimal damage recovery but where large fees might be approved is different, both in kind and degree, from that established by the simultaneous holdings of equity and debt instruments.

*Per se* rules often represent the abdication of judicial discretion rather than its informed exercise. Here, the appellants wish to make the sole fact of dual holdings the basis for disqualification of Weinress as representative plaintiff. That they endeavor to push toward the extreme view appears from their assertion that, even assuming that timely disclosure of the facts concerning stockholdings had been made, Weinress's stockholdings made him an inadequate class representative. How this argument advances the right of Clement J. McDonald, himself a holder both of stock and debt instruments, to serve as a class representative is unclear. The very fact that holders of bonds and debentures may frequently find it desirable to accumulate some shares, if only to secure regular receipt of a corporation's annual reports, militates against a determination that one possessing dual holdings must automatically and necessarily be disqualified from serving as the *dominus litis* in class litigation.

We do not say that it might not be preferable in some actions to fix upon "pure" shareholders or "pure" bondholders as representative parties. Should a district court judge make such a determination early in the proceedings of a class suit, it is highly questionable whether such a ruling would be set aside under the abuse of discretion standard of review. Of course, where the court has initially certified as a representative party one who has dual holdings, it retains full power to alter or amend its ruling later. Fed.R.Civ.P. 23(c)(1). Should it appear very early in the course of the litigation that the dissimilar interests of equity and debt holdings make the named party's representative status unfair to absent class members, the court would no doubt decertify. Where that party has participated in extended and serious settlement negotiations, there may be practical limitations on the use of decertification as an efficient protective measure. Although we recognize that a named party who has secured representative status may adopt such a negotiating stance that the judge would

be required to eliminate all representation allegations under Fed.R.Civ.P. 23(d)(4), we think that the instances mandating such a ruling will arise only infrequently. More typically, the lower courts will turn to notice, intervention, or the other protective measures specified in Rule 23(d)(2). Where, as here, the named party has pursued negotiations to the point of tentative agreement on a compromise or settlement, the court may, as here, provide for independent counsel, additional discovery, and hearings on the objections to the settlement. In such a case, as *Susman* formally recognizes, 561 F.2d 86, 96, judicial control over the settlement and attorney's fees provides adequate protection for the due process rights of absent members.

We have examined the record in this case, and we are persuaded that the district court could properly find, as it did, that the settlement negotiations were at arm's length. We recognize that the Debenture holders relinquished a claim for past interest in exchange for the Milwaukee Road's use of equity accounting and its elimination of the deficit carry forward. We find nothing in the record which provides substantial support for the appellants' contention that Weinress's interests were not wholly compatible with those of absent debenture holders. Because we decline to establish a *per se* rule that dual holdings make a named party an inadequate representative under Rule 23(a)(4) but instead look at the particular record, we find no abuse of discretion in the district court's determination that the objections of the McDonalds aimed at this question were without merit.

## II

The second set of allegations dealing with fraud and collusion pressed by the appellants focuses on questions relating to the attorney's fees for Rosenstein, attorney for the Debenture class. The appellants claim that the provision in the final settle-ment for a $250,000 fund for a subclass of former Debenture holders is a "plain out sham." They devote some attention to the record evidence showing that the Milwaukee Road was willing to arrange for payment by it of reasonable attorney's fees to Rosenstein,[7] observing that under such cases as *Jamison v. Butcher & Sherrerd*, 20 F.R.Serv.2d 1365 (E.D.Pa.1975); and *Norman v. McKee*, 290 F.Supp. 29, 36 (N.D.Cal. 1968), it is inappropriate for a proposed settlement to provide for direct payment of attorney's fees to counsel for class representatives. However, they recognize that the final settlement "back[s] away from an obvious direct payment to Rosenstein." The final settlement agreement provides for the creation of a $250,000 account ostensibly for distribution to former holders of Income Debentures. The McDonalds submit that this "fund" is one created primarily, if not exclusively, for payment of attorney's fees which thereby leaves the impression that defendants are buying themselves out of a lawsuit.

Initially, we note that it is not uncommon for settlement agreements to make provisions for attorney's fees. The Manual for Complex Litigation emphatically disapproves of a provision that fees and expenses of plaintiffs' counsel be paid separately by the defendants over and above the settlement. *See* Manual at 45. It states instead, that "[a]ll amounts to be paid by the defendant(s) are properly part of the settlement fund and should be known and disclosed at the time the fairness of the settlement is considered." *Id.* The Manual further recognizes that "[o]nly if the aggregate of all payments to be made by defendants is disclosed in the proposed settlement can the class members and the court make any intelligent judgment as to the fairness and reasonableness of a proposed settlement." *Id.* at 46. Even when full disclosure is made, however, the Manual observes

7. Rosenstein's affidavit establishes that, toward the end of the meeting on March 29, 1976, Merrill stated to Rosenstein that, notwithstanding the lack of a cash payment to the debenture class in the settlement proposal then being dis-cussed, "Milwaukee Road was willing to provide in the settlement agreement for the payment by it of reasonable attorney's fees to affiant."

that "[w]hen counsel for the class negotiates simultaneously for the settlement fund and for individual counsel fees there is an inherent conflict of interest." *Id.*

In the present case, there is no dispute but that Rosenstein will seek $125,000 out of the $250,000 fund. The central factual issue relates to "simultaneous negotiation" and the underlying reasons for the creation of a special subclass of former Debenture holders. Not surprisingly, the McDonalds and Rosenstein take diametrically opposed views regarding the fund and the subclass. The former point out that the settlement makes absolutely no provision for cash disbursements to former Series B Bondholders, and they attach considerable significance to the testimony of an attorney for the class as showing that former Bondholders cannot properly be distinguished from former Debenture holders.[8] Because it is somewhat unclear why Debenture holders are treated differently, this court asked Rosenstein at oral argument whether the creation of a Debenture subclass was for attorney's fees purposes. Rosenstein responded, in terms akin to the explanation in his affidavit, that he had been serving as counsel for a class defined as of a particular time and that there had to be some payment inasmuch as former Debenture holders could not share in future benefits.[9] The Notice of Settlement, *see* Appendix *infra*, expounds the same rationale.

We find the record, at this point, something less than entirely clear in one respect. On May 19, 1976, approximately three weeks prior to the certification of the Debenture class, the district court had entertained and granted Weinress's motion to amend the complaint in No. 75 C 2033 by deleting the phrase "as of March 15, 1975," from the caption of the case and the preamble to the complaint. The court was apprised of the purpose of this motion as being to "mak[e] clear that the representation is of all debenture holders and that the matters at issue in the instant case include all claims of holders of the debentures past and present." Nevertheless when the order of certification was entered there was no time reference but the certification simply specified the class as being "[a]ll owners of Chicago, Milwaukee, St. Paul and Pacific Railroad Company 5% Income Debentures, Series 'A', due January 1, 2055, whether said debentures are registered or unregistered."

We can only read this order, obviously prepared by Rosenstein and adopted verbatim by the district court, in view of the action of just three weeks earlier as encompassing not only owners as they might exist

8. "Q. How are they different from the debentures in that respect [*i. e.*, no place in the settlement for a fund for former holders of B Bonds]?

"A. It is our view that the—anybody who sold their bonds after the institution of this case, sold them knowing that, at least in law, that the case was pending. And that their rights passed on to the purchase[r]s of the bonds.

"Q. Well, how is that different from the debentures?

"A. I have not—I do not wish to comment on that. I am simply stating what our position is with respect to the Series B Bonds. Mr. Rosenstein apparently has a different theory in respect to the debentures. And I am not here to testify as to the debentures."

9. Rosenstein's affidavit, filed in support both of the settlement and his fee request, states:

Affiant met promptly [on March 29, 1976] with Weinress to consider the proposed settlement. When they had instituted settlement discussions in 1975, Weinress and Affiant had agreed that a settlement along the lines then suggested by them was in the best interests of the debenture class, and the proposal presented in March, 1976, in fact, represented substantially what they had been unable to achieve in the 1975 negotiations. However, as there was to be a cash payment to the Series B bondholders Affiant and Weinress concluded that they seek cash payment at least to those class members who would not receive the future benefits of the settlement (which Weinress believed would be reflected in higher market prices for the debentures) because they had already sold their debentures. The Weinress complaint contended that an interest payment should have been made on March 15, 1975 to the people who then were debenture holders. Any class member who should have received such payment but who had sold his debentures in the intervening months would receive nothing from the settlement if only future benefits were secured.

at any particular time during the litigation but all holders without limitations as to a specific time. Because the record contains no explication of what might appear to be a facial inconsistency we can only assume that it was intended to provide some necessary flexibility. In any event, while this date was eliminated in the caption and preamble, the complaint remained unchanged in seeking the interest payment claimed to be due to the holders of Debentures as of March 15, 1975. The settlement agreement provided that the Railroad would interpret the Debenture Indenture substantially as the Weinress complaint contended it should be but "[i]n addition to the foregoing, in order to provide compensation to persons who were holders of Debentures on March 15, 1975 (the date when the *Weinress* complaint contends interest with respect to the year 1974 should have been paid) but who sold debentures prior to August 6, 1976 (the date the settlement agreement was signed) and thus would not share in the future benefits described above," the Railroad agreed to pay the stipulated sum for the benefit of such past holders.

We are not unmindful of the considerable give and take, the concessions and even the accommodations that go into the task of reaching a settlement of complex litigation and of the necessity of viewing the *fait accompli* as a whole in determining whether the competing interests are settled in such a manner that they should not be unscrambled on review and put back into litigation, particularly where as here the public interest is vitally involved; and this overview will prevail ordinarily even though upon scrutiny of components some less than perfectly logical consistency throughout may be arguably demonstrated. The district court during the course of pleading was aware of the concerns of Weinress and Rosenstein to the effect that there might be some confusion as to whether the claims of past holders were in issue. We are unable on this record to say that the appellants are correct in saying that a subclass was created as a sham whose only purpose was to disguise the direct payment of legal fees.

The appellants, however, advance additional reasons which, in their view, dispel any possibility that the creation of the subclass was done out of concern for that class. They note that the notice to the class contained no claim form for that class, that nothing in the record indicates how or when that class will be notified, and that any amount unclaimed is to be returned to the Milwaukee Road under the terms of the judgment. They suggest that the lower court was extremely naive in concluding that the $250,000 sum was going to benefit anyone other than Rosenstein.

We find no merit in these arguments. The judgment order provides a formula by which the amount of payment to past Debenture holders is calculated. The First National Bank of Chicago is directed to make payments to those who present satisfactory evidence that they were holders on March 15, 1975, but subsequently sold their Debentures prior to August 6, 1976. Additional notice to former holders is merely cumulative to the notice they have already received. That the unclaimed amount reverts to the railroad is inconsequential, for it is speculative to assume that investors awarded a valuable right to cash payments will not avail themselves of the opportunity to secure it. We regard the reference to the supposed naivete of the judge as "representative of the 'brief writer's hyperbole' syndrome," *United States ex rel. Sims v. Sielaff*, 563 F.2d 821, 824 n.6.

We note that the reversion provision applicable to the Debenture subclass, rather than demonstrating judicial naivete, presents an interesting solution to a recurrent problem. No such provision has been inserted in the judgment order with respect to the other class actions. When the district court turns to the task of ruling upon fee requests in those suits, he may confront, as in *Prandini v. National Tea Company*, 557 F.2d 1015 (3d Cir. 1977), problems relating to ex parte applications. As to the fund for the Debenture subclass, however, the Milwaukee Road retains an economic incentive to contest Rosenstein's fee request, by virtue of the opportunity to regain a portion of the account on deposit.

We find it unnecessary at this point to determine whether this circuit should follow the approach suggested by the *Prandini* court. The judgment appealed from contemplates future court orders pertaining to fees and expenses. Upon fee applications by counsel for the various classes, the district judge will have an initial opportunity to consider the applicability of the *Prandini* guidelines. Section 1.47 of the Manual for Complex Litigation provides appropriate guidance regarding judicial control of fees and expenses, and by resorting to the Manual and the reasoning of the *Prandini* court, the district court can be expected to resolve any remaining fee problems in this case.

In sum, we conclude that the creation of the subclass of Debenture holders was not a "plain out sham" requiring that the settlement be set aside. Nor can we say that there is record support for allegations that Rosenstein negotiated simultaneously for the fund and for individual counsel fees. There may be some remaining problems regarding fees and expenses, but the appellants' attempt to elevate such problems to the level of fraud and collusion requiring a renewal of this litigation must be rejected.

### III

Earlier herein, we have noted that this consolidated appeal presents the typical issue of whether or not the district court abused its discretion by approving the settlements as fair, reasonable, and adequate as to the classes. The appellants have asserted, correctly we think, that two of their strongest arguments pertained to conflict of interest on the part of Weinress and his attorney and the evidence in the record that the railroad and the Debenture class representatives were not bargaining at arm's length. However, the appellants do present other arguments designed to persuade this court to set aside the approval of the lower court. Although we find no substantial merit in any of the appellants' remaining arguments, we shall give attention to those which are not totally without an arguable basis.

Appellant Clement McDonald presses a multi-faceted due process argument. He claims a constitutional violation because the settlement agreement disposes of none of the issues raised by his complaint. This prong of the argument fails to grapple with the fact that the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation, a particularly important objective in this case, involving as it does various classes of securities. *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488. However, McDonald notes that only in infrequent instances are settlements approved over the objection of the named plaintiff. He claims that his business judgment, not that of his original attorneys, should have prevailed. Specifically, he asserts that "it violate[s] due process for the court to remove McDonald from his position as *dominus litis* and to substitute his attorneys without any finding that McDonald's judgment was impaired."

First, we think it inaccurate to state that the court removed McDonald as a plaintiff. What happened was that the court after hearings rejected McDonald's nine objections. Nonetheless, McDonald's reliance on *Saylor v. Lindsay*, 456 F.2d 896 (2d Cir. 1972), is misplaced. That case expressly held that the assent of the plaintiffs who brought the derivative action was not essential to a settlement. 456 F.2d at 899. In the instant case, the performance of McDonald's original attorneys differed radically from that of Saylor's attorney, inasmuch as they kept him informed of the settlement negotiations, informed the district court of his objections, and thereby enabled the lower court to devise procedures by which McDonald could press his challenges to the compromise. *Compare Saylor, supra*, 456 F.2d at 900.

We have no quarrel with McDonald's contention that the decision whether or not to accept a settlement is an exercise of business judgment by the parties, and we fully recognize that the business judgment of the court is not to be

substituted for that of the parties whose business is involved. *United Founders Life Insurance Company v. Consumers National Life Insurance Company*, 447 F.2d 647, 655 (7th Cir. 1971). Instead, the court must weigh the probabilities and possibilities of victory or defeat as indicated by the legal or factual situation presented and determine whether the compromise agreement, taken as a whole, is in the best interest of the parties seeking relief. *Cf. id.*

■ The "legal or factual situation" presented in the instant consolidated case is one where the defendants have denied liability on all theories and have vigorously defended the consolidated case. The district court held two hearings, had several pre-trial conferences, and afforded the objectors McDonalds, both father and son, every opportunity to be heard, to express their objections, conduct discovery and develop the record. They had many occasions to present alternative proposals, but they did not do so. Like the appellants in *United Founders, supra* at 656, their inability or unwillingness to find a better solution must be considered as a salient factor. The instant case is clearly distinguishable from those where settlements were not approved because objectors were denied the opportunity to present their case. *E. g., Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975); *Percodani v. Riker-Maxson Corp.*, 50 F.R.D. 473 (S.D.N.Y.1970); *Weiss v. Chalker*, 55 F.R.D. 168 (S.D.N.Y.1972). The argument that due process was violated is unfounded.

Appellants Clement and Raymond McDonald both argue that the lower court failed in its fiduciary duty to evaluate all of their contentions in the light of a full record and to make reasoned findings of fact and conclusions of law susceptible of review by this court. Citing *American Employers' Insurance Co. v. King Resources Co.*, 20 F.R.Serv.2d 161, 163 (D.C.Colo.1975), they submit that the lower court "utterly failed" in its fiduciary duty to protect the interest of all parties in a class action, including those of an objector. Appellant Clement McDonald specifically characterizes the findings and conclusions of the lower court,

which found no merit in his nine objections, as the kind of "boiler plate" against which the Supreme Court directed scathing criticism in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

In *TMT Trailer Ferry*, the district court approved an internal plan of reorganization, which compromised certain claims, in a three-sentence statement which constituted its only, and last, word on the merits of those compromises. 390 U.S. at 432–33, 88 S.Ct. 1157. The lower court's determination that the compromises were fair and equitable under the circumstances represented an acceptance of the bald conclusions of the trustee, despite the fact that substantial facts in the record cast doubt on the creditors' claims, that the trustee had once concluded that the mortgage was null and void and that the debtor had sizeable setoffs against its holders, that the trustee had once sought reference of other claims to a special master for investigation, and that the trustee had never placed on the record any of the facts of his subsequent investigation and had never provided any explanation of why he had completely reversed his field on the claims. 390 U.S. at 433–34, 88 S.Ct. 1157. The Supreme Court recognized that if the trial court's three-sentence statement had been the result of an adequate and intelligent consideration of the merits of the claims, the difficulties of pursuing them, the potential harm to the debtor's estate caused by delay, and the fairness of the terms of the settlement, the trial court would without question have been justified in approving the proposed compromises. *Id.* at 434, 88 S.Ct. 1157. However, the lower court's statement represented "a bare statement of conclusion . . . .." *Id.* at 435, 88 S.Ct. 1157.

■ Here, the district court expressed its findings and conclusions in sixteen distinct paragraphs. Paragraph 4 of the findings constitutes an extended analysis of the benefits of the proposed settlement, while Paragraph 5 determined that the settlement was not only in the best interest of all

parties but also in the public interest, inasmuch as it removed a serious threat to the financial viability of the Milwaukee Road.

We do not say that the final formulation of the findings and conclusions represents a model which need be emulated. However, we must heed the caution of the *TMT Trailer Ferry* Court that

> [i]f, indeed the record contain[s] adequate facts to support the decision of the trial court to approve the proposed compromises, a reviewing court would be properly reluctant to attack that action solely because the court failed adequately to set forth its reasons or the evidence on which they were based.

390 U.S. at 437, 88 S.Ct. at 1170. The alleged inadequacy of explanation in the instant case represents, in our view, a deficiency which is "a merely formal one." *Id.* We remain mindful that in reviewing the appropriateness of the settlement approval, we should intervene only upon a clear showing that the trial court was guilty of an abuse of discretion. *United Founders, supra* at 655. If the appellants were correct in their assertions about the utter failure of the district court to fulfill the duties specified in *King Resources, supra,* there would be a ground for appellate intervention. Upon analysis, however, we are persuaded that the district court could properly find that all of the objections proffered by the two McDonalds were without merit.

### IV

Because the complaints in the Series B and Debenture cases involved different indentures, the fundamental arguments of the two appellants do diverge somewhat. Both appellants, however, basically rest their case upon the assertion that the settlement is not fair, adequate, and reasonable, so that the district court erred reversibly in approving it.

Appellant Clement McDonald observes that the settlement of the Series B action calls for a payment by the Milwaukee Road of approximately $2,501,000, which is less than 50% of the $5,448,000 which Series B plaintiffs could recover if completely successful. He further notes that only $1,100,-816.50 is being applied to the $4,046,562 which the defendant railroad admits is accrued and owing as of December 31, 1975, thereby reducing the accrual to $2,945,-745.50. He argues that since the maximum accrual is three full years' interest ($4,203,-000), there is only "room" for an additional $1,256,000 of accruals. He contends that only $1,256,000 rather than the full year's interest of $1,401,000 will accrue, and that if 1977 is a loss year for the railroad there will be no accruals for 1977.

We regard Clement McDonald's concern about a possible difference of $145,000 in potential accruals as representative of his basic position that the total dollar amount is not adequate and that an improvement in the total sum could be achieved. However, the record affirmatively discloses that the defendants, at one point in the negotiations, were totally opposed to any cash payment at all. We cannot say that the district court abused its discretion in approving a settlement which amounts to approximately 45.92% of the amount obtainable if the Series B class successfully litigated its various claims for interest recovery. A court cannot and should not "balance the scales with the nicety of an apothecary." *Glicken v. Bradford,* 35 F.R.D. 144, 152 (S.D.N.Y.1964). While Clement McDonald contends that there are no hard facts in the record on which to base a conclusion that the railroad was unable to pay a judgment in the full amount to which Class B plaintiffs were entitled, we note that the record contains testimony by an expert witness regarding the unsatisfactory cash position of the Milwaukee Road. We have no basis for upsetting the district court's implied determination that the cash amounts fell within the range of reasonableness.

Appellant Raymond McDonald, lacking the opportunity to focus upon inadequacy of cash consideration, argues that Count II of the complaint in the Debenture case presents a sound basis for recovery of interest in full for 1973 and 1974 based on the facts in the record. He notes that the allegations of that count essentially assert

that the Milwaukee Road had "Available Net Income," as defined in the Debenture Indenture, under either one of two theories. The first is that the defendant railroad controlled the Milwaukee Land Company (Land Company) and other subsidiaries and that the common officers and directors had a fiduciary duty to cause Land Company to pay and declare dividends out of their earnings each year. The second theory alleges that when the defendants caused Land Company to make long-term loans to the Milwaukee Road and to Chicago Milwaukee Corporation, and when they entered into loan transactions for the benefit of the holding company, the money benefiting the parent corporations was in fact constructive dividends and, hence, "Available Net Income" to the Milwaukee Road.

Thus, Raymond McDonald vigorously objects to the use by the defendants of what he labels the "simple device" of having the directors of Land Company fail to declare dividends. He observes that "the evidence taken so far shows that defendants withheld dividends not for any *valid corporate* purpose, but for the specific purpose of avoiding payment of contingent interest . . ." Further, assuming *arguendo* that the settlement was properly approved, he charges error in the lower court's denial of a motion to sever Count II in the event of approval of the settlement. He contends that Weinress, by adopting Count II, made it subject to the dismissal provisions of the settlement and so deprived the class of Debenture holders of whatever rights it might have to pursue a recovery under the theories of Count II.

We think this argument rests upon a faulty premise and merely duplicates the due process contention already rejected. First, the Debenture holders are not completely deprived of recovery rights. Assuming *arguendo* that the defendants in this consolidated suit acted improperly in the loan transactions and assuming further that The First National Bank of Chicago, trustee under the Debenture Indenture, was either aware or should have been

aware that the defendants were so acting, members of the class could seek to surcharge the trustee because of its supposed breach of a fiduciary duty. The First National Bank was never a party to the suit and is not affected by its compromise. Thus, although the settlement removes the possibility of any direct claims for past interest by class members against the present defendants, it does not obliterate rights of recovery against the trustee for its misfeasance, if such did in fact exist.

Second, the inherent nature of a compromise is to give up certain rights or benefits in return for others. In the instant case, the balancing is between the future right to equity accounting and the elimination of the deficit carry forward against the past claimed right to interest payments. Severance of the second count of the Debenture complaint through the lower court's grant of McDonald's motion would have been totally inconsistent with approval of the proposed settlement with its release of past claims. Upon analysis, McDonald's *arguendo* assumption of a proper settlement approval accompanied by an erroneous denial of the severance motion cannot stand. In essence, this approach merely restates in different terms the notions that approval of a settlement over objections of a party violates due process or that the actual terms to the settlement were inadequate and unfair. Earlier herein, we have rejected the due process contention. Upon comparison of the future benefits to Debenture holders and their loss of past interest payments, we are unable to conclude that the district court abused its discretion in finding the proposed settlement reasonable and fair.

The appellants have presented still other arguments ranging from a claim of incomplete discovery to a claim that approval of the settlement effectively sets aside the 1944 order of the district court approving a plan of reorganization for the railroad. It would unnecessarily prolong this opinion to set out our reasons for rejecting such contentions. It suffices to state that we are

unable to view these arguments as constituting such a clear showing of an abuse of discretion under the standards articulated in *United Founders, supra,* as to require us to set aside the order of approval. Accordingly, the judgment appealed from must be, and hereby is, affirmed.

AFFIRMED.

## APPENDIX

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Clement J. McDonald, etc. <br>     *Plaintiff* <br><br>  —vs— <br><br> Chicago Milwaukee Corporation, et al. <br>     *Defendants* | No. 74 C 780 |
| Morton Weinress, etc. <br>     *Plaintiff* <br>   and <br> Raymond J. McDonald <br>     *Intervenor* <br><br>  —vs— <br><br> Chicago Milwaukee Corporation, et al. <br>     *Defendants* | No. 75 C 2033 |
| Morton Koch, etc. <br>     *Plaintiff* <br>   and <br> Harry Lewis, etc. <br>     *Plaintiff-Intervenor* <br><br>  —vs— <br><br> Chicago Milwaukee Corporation, et al. <br>     *Defendants* | No. 76 C 2598 |

### NOTICE OF PENDENCY OF CLASS ACTIONS
### AND PROPOSED SETTLEMENT

TO: ALL PRESENT HOLDERS AND CERTAIN FORMER HOLDERS OF THE FOLLOWING SECURITIES:

Chicago, Milwaukee, St. Paul and Pacific Railroad Company General Mortgage $4\frac{1}{2}$% Income Bonds, Series A, due January 1, 2019, (hereinafter referred to as "Series A Bonds");

Chicago, Milwaukee, St. Paul and Pacific Railroad Company General Mortgage $4\frac{1}{2}$% Convertible Income Bonds, Series B, due January 1, 2044, (hereinafter referred to as "Series B Bonds");

Chicago, Milwaukee, St. Paul and Pacific Railroad Company 5% Income Debentures due January 1, 2055, (hereinafter "Debentures");

The Southern Indiana Railway Company $2\frac{3}{4}$—$4\frac{1}{4}$% First Mortgage Bonds due January 1, 1994, (hereinafter "Terre Haute Bonds");

The Bedford Belt Railway Company 2¾—4¼% First Mortgage Bonds due January 1, 1994, (hereinafter "Terre Haute Bonds");

The Chicago, Terre Haute and Southeastern Railway Company 2¾—4¼% First and Refunding Mortgage Bonds due January 1, 1994, (hereinafter "Terre Haute Bonds"); and

The Chicago, Terre Haute and Southeastern Railway Company Income Mortgage 2¾—4¼% Bonds due January 1, 1994, (hereinafter "Terre Haute Bonds").

Pursuant to Rule 23 of the Federal Rules of Civil Procedure and by Order of the Honorable George N. Leighton, United States District Judge, YOU ARE HEREBY NOTIFIED:

The above captioned lawsuits are not pending in the United States District Court for the Northern District of Illinois before the Honorable Judge George N. Leighton and have been consolidated for purposes of settlement only. The issues raised by these lawsuits involve the securities described above and if you are a member of any class described in paragraph 2 hereof you should read this Notice carefully.

## 1. PURPOSES OF NOTICE

If you are presently the holder of any of the foregoing securities, or if you were a holder of any Debentures on March 15, 1975 but sold them prior to August 6, 1976, you are a member of one or more of the classes and your rights will be affected by these lawsuits and the Agreement of Settlement. This notice is not to be understood as any expression of any opinion by this Court as to the merits of any of the claims or defenses asserted by either side in the lawsuit or as to any amount that any claimant would receive on settlement, but is given for the sole purpose of informing you of the pendency of the lawsuit and the Agreement of Settlement so that you may make appropriate decisions as to what steps, if any, you may wish to take in relation thereto.

## 2. DESCRIPTION OF THE LAWSUITS AND CLASSES

(a) *McDonald, etc. vs. Chicago Milwaukee Corporation, et al.*

This case is a class action brought on behalf of all owners of Series B General Mortgage Bonds whether registered or un-

registered. The defendants are Chicago Milwaukee Corporation (hereinafter "CMC"), Chicago, Milwaukee, St. Paul and Pacific Railroad Company (hereinafter "Railroad") and certain individual officers and directors of each. The United States of America is a nominal defendant. The complaint as supplemented and amended alleges, in substance, (1) that certain subsidiaries of the Railroad are "Railroad Subsidiaries" as defined in the General Mortgage, the undistributed income of which should have been included in the calculation of "Available Net Income" for the purpose of determining whether contingent interest was payable on the Series B Bonds for the years 1969—1974; (2) that certain loans to Railroad from one of its subsidiaries should be treated as dividends to Railroad and included in the calculation of "Available Net Income" for the purpose of determining whether contingent interest was payable on the Series B Bonds for the years 1969—1974; and (3) that an order of the Interstate Commerce Commission relating to the equity method of accounting requires the Railroad to include in its calculation of "Available Net Income" for the year 1974 and thereafter, its proportionate share of the undistributed earnings and losses of all subsidiaries in which the Railroad owns voting stock sufficient to give it the ability to significantly affect the operating or financial policies of the subsidiary. Plaintiff has filed a Motion for Summary Judgment regarding the "Railroad Subsidiary" issue described in clause (1) hereof.

All defendants have denied all of the above claims and have denied that there are

now due and owing any of the claimed amounts or any part thereof, and have denied that the plaintiff and the class are entitled to any relief whatsoever.

(b) *Weinress, etc. vs. Chicago Milwaukee Corporation et al.*

This is a class action brought on behalf of all owners of Debentures, whether registered or unregistered, and persons who were such owners on March 15, 1975, but sold all or some of them prior to August 6, 1976. The original complaint named the Railroad as the sole defendant. The United States of America is a nominal defendant. The complaint seeks payment of interest with respect to the year 1974 and declaratory relief construing certain provisions of the Debenture Indenture. The constructions sought are (1) that the Debenture Indenture does not permit the Railroad to carry forward deficits in "Available Net Income" from one calendar year to a succeeding calendar year and (2) that a September 27, 1974 order of the Interstate Commerce Commission required the Railroad to include in its 1974 and subsequent determinations of "Available Net Income" for the payment of interest on the Debentures, its proportionate share of undistributed earnings and losses of all subsidiaries and companies in which the Railroad owns 20% or more of the voting stock and also to reflect in the retained income accounts of the Railroad the proportionate share of the accumulated undistributed earnings and losses of such subsidiaries or companies from dates of acquisition up to January 1, 1974.

In June, 1976, Raymond McDonald was given permission to intervene in this case and a second count to the complaint was filed. The second count added certain individual officers and directors of the Railroad as defendants. Count II also seeks interest for the year 1974, as does Count I, but on a different theory; namely, that if, "available net income" had been correctly computed there would be no accrued income owing on debt senior to the debentures (i.e. of the A bonds, and B bonds and the Terre Haute bonds) but there would have been sufficient available net income to pay the debenture holders in 1974 even without the September 27th, 1974 order of the Interstate Commerce Commission. Furthermore, by the same theory Count II alleges that interest should have been paid on the debentures for 1973 as well as 1974.

All defendants have denied all of the above claims and have denied that there are now due and owing any of the claimed amounts or any part thereof, and have denied that the plaintiff and the class are entitled to any relief whatsoever.

(c) *Koch, etc. vs. Chicago Milwaukee Corporation, et al.*

This case is a class action brought on behalf of all holders of Series A Bonds. The defendants are Chicago Milwaukee Corporation and the Railroad. The United States of America is a nominal defendant. The issues in this case are substantially similar to those in the *McDonald* case: (1) whether certain subsidiaries are to be considered "Railroad Subsidiaries" for purposes of the calculation of "Available Net Income" under the General Mortgage governing the Series A Bonds and (2) whether the equity accounting order of the Interstate Commerce Commission requires the Railroad to include the undistributed income of certain subsidiaries in the calculation of "Available Net Income" under the General Mortgage.

Harry Lewis, an owner of Terre Haute Bonds, has been permitted to intervene in the *Koch* case. His Intervenor's Complaint asserts a class action on behalf of all owners of Terre Haute Bonds which have been assumed by the Railroad. The Intervenor's Complaint adds certain officers and directors of CMC and the Railroad and raises the "Railroad Subsidiary", equity accounting and loan/dividend issues as described in the *McDonald* case and alleges that the Railroad changed its accounting records to record a dividend as a loan.

All defendants have denied all of the above claims and have denied that there are now due and owing any of the claimed amounts or any part thereof, and have de-

nied that the plaintiff and the class are entitled to any relief whatsoever.

(d) *Lewis, etc. vs. Chicago Milwaukee Corporation, et al.*

This is a class action originally brought in the Supreme Court of the State of New York, County of Kings. The case was removed to the United States District Court for the Eastern District of New York and was transferred to the Northern District of Illinois. The suit is brought on behalf of all holders of Terre Haute Bonds and its allegations are included in the Intervenor's Complaint filed by plaintiff Lewis in the *Koch* case described above. Because the allegations of the *Lewis* case are included in the *Koch* case, on September 24, 1976, the *Lewis* case was dismissed.

### 3. THE SETTLEMENT

The attorneys for plaintiffs and defendants in all three cases have agreed, subject to the approval of the Court, to a settlement which will constitute a full and final settlement of all claims (subject to the exception hereinafter described) of all members of each of the classes of plaintiffs, and as to each and all of the defendants, their respective predecessors, successors, affiliates, officers, directors, employees, agents, personal representatives, heirs and assigns.

The principal terms of the settlement are as follows:

(a) series A Bonds: The Railroad will pay the sum of $1,131,781.50, being equal to one year's unaccrued interest on the Series A Bonds, the total interest claimed. After allowing for payment of such attorneys' fees and expenses as may be allowed by the Court, the balance of said sum shall be paid, as to coupon bonds, upon surrender of the coupon falling due on the interest payment date next following the Effective Date and as to registered bonds to the registered holder as of the same interest payment date. Jerome H. Torshen and Sherwin S. Zeitlin, counsel for the plaintiff and the class in the *Koch* action, intend to file a petition for counsel fees not to exceed 25 percent of the settlement amount of the *Koch* action. The amount to be paid to each holder shall be determined by multiplying such balance by a fraction, the numerator of which shall be the principal amount of Series A Bonds held by the holder, and the denominator of which shall be the aggregate principal amount of Series A Bonds outstanding on such date.

(b) Terre Haute Bonds: The Railroad will pay the following amounts, equal to the contingent portion (1½%) of one year's unaccrued interest on the outstanding Terre Haute Bonds:

The Bedford Belt Railway Company 2¾—4¼% First Mortgage Bonds due January 1, 1994 ................ $ 2,670.00

The Southern Indiana Railway Company 2¾—4¼% First Mortgage Bonds due January 1, 1994 ................ $ 82,470.00

The Chicago, Terre Haute and Southeastern Railway Company 2¾—4¼% First and Refunding Mortgage Bonds due January 1, 1994 ............................. $107,550.00

The Chicago, Terre Haute and Southeastern Railway Company Income Mortgage 2¾—4¼% Bonds due January 1, 1994 ......................................... $ 71,082.00

After allowing for payment of such attorneys' fees and expenses as the Court may allow, the balance of said sums shall be paid, as to coupon bonds, upon surrender of the contingent interest coupon falling due on the interest payment date next following the Effective Date and as to registered bonds to the registered holder as of the same interest payment date. Robert A.

Stull, counsel for plaintiff and the class in the *Lewis* intervention, intends to file a petition for counsel fees not to exceed 25 percent of the settlement amount of the *Lewis* intervention. The amount to be paid to each holder of Terre Haute Bonds shall be determined by multiplying such balance by a fraction, the numerator of which shall be the principal amount of Terre Haute

Bonds held by the holder, and the denominator of which shall be the aggregate principal amount of Terre Haute Bonds outstanding on such date.

(c) Series B Bonds: The Railroad will pay the sum of $2,501,549.50, consisting of $1,100,816.50 which shall be credited against the accrued but unpaid interest on Series B Bonds, which, at December 31, 1975, amounted to $4,046,562 (thereby reducing such accrual to $2,945,745.50), and $1,400,733 which is equal to one year's unaccrued interest on the Series B Bonds. This equals $8.04 per $100 face value of each Series B Bond before payment of attorneys' fees and expenses. After allowing for payment of such attorneys' fees and expenses as may be allowed by the Court, the balance of said sum of $2,501,549.50 shall be paid, as to coupon bonds, upon surrender of the coupon falling due on the interest payment date next following the Effective Date and as to registered bonds to the registered holder as of the same interest payment date. Harold E. Spencer, Peter N. Todhunter and Richard James Stevens, counsel for the plaintiff class in the *McDonald* action, intend to file a petition for counsel fees not to exceed 25 percent of the settlement amount of the *McDonald* action. The amount to be paid to each holder shall be determined by multiplying such balance by a fraction, the numerator of which shall be the principal amount of Series B Bonds held by the holder, and the denominator of which shall be the aggregate principal amount of Series B Bonds outstanding on such date.

(d) Debentures: For the future Railroad will agree to interpret the Debenture Indenture substantially in the manner sought in the *Weinress* complaint. Thus, it will cease its practice of carrying forward deficits in "Available Net Income" from one calendar year to succeeding calendar years, except in limited circumstances. The effect of such change will be to completely eliminate a deficit carry forward amounting to $40,304,535 which the Railroad contends existed as of December 31, 1975. As a result interest will be payable in 1977 to debenture holders if "Available Net Income" for

1976 exceeds $8,166,000 (the amount necessary for payment of prior ranking claims) rather than $48,470,535.

Also, the Railroad has agreed effective January 1, 1975, for purpose of computing "Available Net Income" under the Debenture Indenture, to follow the principles of equity accounting as set forth in the order of the Interstate Commerce Commission in Docket No. 35949. As a result the calculation of "Available Net Income" for the Debentures will in the future include the earnings of several heretofore profitable subsidiaries of the Railroad, including Milwaukee Land Company. Because the effective date for the adoption of such equity accounting principles under the settlement is to be January 1, 1975, rather than January 1, 1974, no interest will be payable to holders of Debentures with respect to the year 1974, except as to the limited extent provided below. Also because of the losses which were incurred by the Railroad in 1975 no interest will be payable to holders of Debentures with respect to that year even upon the inclusion of such earnings of subsidiaries.

In addition to the foregoing, in order to provide compensation to persons who were holders of Debentures on March 15, 1975 (the date when the *Weinress* complaint contends interest with respect to the year 1974 should have been paid) but who sold debentures prior to August 6, 1976 (the date the settlement agreement was signed) and thus would not share in the future benefits described above, the Railroad will pay the sum of $250,000, which after allowing for payment of such attorneys' fees and expenses as may be allowed by the Court, shall be distributed pro-rata among Debenture holders who establish that they owned Debentures on March 15, 1975, and sold such Debentures subsequent thereto and on or before August 6, 1976. David D. Rosenstein, counsel for plaintiff and the class in the *Weinress* case, intends to file a petition for counsel fees and actual expenses incurred not to exceed 50 percent of the special fund for these Debenture holders who will not share in the future benefits of the settlement. Payment to each holder shall

be in the proportion of such balance which the principal amount of Debentures owned and sold by such holder bears to the aggregate principal amount of all Debentures so owned and sold but not to exceed $50 per $1,000 principal amount of Debentures.

The settlement agreement also provides that the sums of unaccrued interest which are to be paid to the prior ranking Series A and Series B General Mortgage Bonds and Terre Haute Bonds pursuant to the settlement shall not reduce future calculations of "Available Net Income" as to the Debentures.

(e) Equity Method of Accounting—All Cases: In addition, as to each of the aforementioned securities, the Railroad agrees that, effective January 1, 1975, in computing Available Net Income it will interpret the General Mortgage and Debenture Indenture to require it to follow the principles of equity accounting, as set forth in the order of the Interstate Commerce Commission dated September 27, 1974, in Docket No. 35949. *The Equity Method of Accounting for Certain Long-Term Investments in Common Stocks*, and it will include in the computation of such Available Net Income for the year ended December 31, 1975, and for all subsequent years its proportionate share of the undistributed earnings of those entities falling within the scope of instruction 6–2(b)(1) of Part 1201 of 49 CFR, so long as such instruction shall remain substantially in effect. This shall not be construed to require Railroad to include in the computation of such Available Net Income for any year the undistributed earnings of such entities from the date of acquisition of such entities up to January 1, 1975. The Railroad agrees that, if at any time while any of the aforementioned securities shall be outstanding, the aforesaid instruction 6–2(b)(1) of Part 1201 of 49 CFR shall no longer remain substantially in effect and the Railroad ceases to apply said instruction any holder of such securities may then pursue any theory or remedy in support of any claim of such holder as to the future application of the term "Available Net Income" as used in the General Mortgage and the Debenture Indenture.

## 4. EFFECTIVE DATE OF SETTLEMENT

Under the Agreement of Settlement, no distribution of any of the funds to any claimant will be made until (a) all of the conditions set forth in the Agreement of Settlement have been satisfied, (b) the Court has finally approved the amount of fees, costs, and disbursements for counsel for the several plaintiffs and the class, (c) the Court has approved the distributions and the amounts thereof to the holders of the several classes of securities affected thereby, and (d) the Court has entered a final judgment of dismissal with prejudice binding on the several plaintiffs and all members of all of the classes, and such judgment shall have become final either by affirmance or expiration of the time for appeal.

Now Therefore, Take Notice:

1. These being class actions under Rule 23(b)(1) of the Federal Rules of Civil Procedure, no member of any class may elect to request exclusion from the class or from the effect of any judgment herein.

If you are a member of any one or more of the foregoing classes, you will be barred from any future proceedings, hearings, or any other matter in connection with the claims covered by the several lawsuits, including the entry of final judgment dismissing with prejudice any claims you may have as a member of any one or more of such classes against the defendants, their respective predecessors, successors, affiliates, officers, directors, employees, agents, personal representatives, heirs and assigns.

If you are a member of any of the affected classes, you will be bound to look only to the appropriate settlement fund or funds for relief as to any claims you may have against the defendants, and you will be bound by any judgments entered by the Court.

2. A hearing on the proposed settlement will be held on November 10, 1976, at 2:15 p.m. Chicago time, in the United States

District Court for the Northern District of Illinois, Eastern Division, before the Honorable George N. Leighton, United States District Judge, United States Courthouse, 219 South Dearborn Street, Chicago, Illinois. The purpose of the hearing will be to determine whether the Court should approve the settlement and enter a final judgment of dismissal with prejudice in favor of the defendants and against the plaintiffs and members of the classes thereby barring their claims against the defendants, their respective predecessors, successors, affiliates, officers, directors, employees, agents, personal representatives, heirs and assigns.

At the hearing, leave shall be given to participating members of the several classes to be heard or to file memoranda on such issues.

However, at such hearing no member of any class who desires to object to the settlement will be heard and no paper submitted by or on behalf of any such member will be received or considered by the Court, except as the Court may in its discretion otherwise direct, unless such member desiring to be heard or to submit papers files with the undersigned on or before November 3, 1976, his objections in writing, together with all papers to be submitted to the Court at the hearing, and serves copies thereof upon:

Todhunter and Stevens
135 South LaSalle Street
Chicago, Illinois 60603
    Attorneys for Plaintiffs in *McDonald*

David D. Rosenstein, Esq.
11 South LaSalle Street
Chicago, Illinois 60603
    Attorney for Plaintiffs in *Weinress*

Jerome H. Torshen, Esq.
Sherwin S. Zeitlin, Esq.
11 South LaSalle Street
Chicago, Illinois 60603
    Attorneys for Plaintiffs in *Koch* and
        for Intervenor in *Koch* and plaintiff
        in *Lewis*

Gardner, Carton & Douglas
One First National Plaza
Chicago, Illinois 60603
    Attorneys for Defendants in all cases

---

Clement J. McDonald, the plaintiff in the *McDonald* case has indicated that he will file an objection to the Settlement.

3. The Agreement of Settlement and all other papers filed in the lawsuit may be

examined and copied at any time during regular office hours at the office of the Clerk, United States Courthouse, 219 South Dearborn Street, Chicago, Illinois.

H. Stuart Cunningham
Clerk, United States District Court for the Northern
    District of Illinois, Eastern Division
219 South Dearborn Street
Chicago, Illinois 60604